UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| XL SPECIALTY INSURANCE COMPANY | CIVIL ACTION  12-CV-2071 |
| Plaintiff | SECTION: "_" (_) |
| VERSUS | DISTRICT JUDGE: |
| | HON. _____ |
| BOLLINGER SHIPYARDS, INC., BOLLINGER SHIPYARDS LOCKPORT, L.L.C., AND HALTER BOLLINGER JOINT VENTURE, L.L.C.. | MAGISTRATE JUDGE: |
| Defendants | HON. _____ |

### PLAINTIFF XL SPECIALTY INSURANCE COMPANY'S
### ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

**NOW COMES** XL Specialty Insurance Company ("XL Specialty"), Plaintiff, and files this, its Original Complaint for Declaratory Judgment, pursuant to 28 U.S.C. § 2201, *et seq*. and Federal Rule of Civil Procedure 57, against the Defendants, Bollinger Shipyards, Inc., Bollinger Shipyards Lockport, L.L.C., and Halter Bollinger Joint Venture, L.L.C. (collectively, "Bollinger") and would show the Court as follows:

### The Parties

1.    The Plaintiff, XL Specialty, is a Delaware corporation with its principal place of business in Connecticut.

2.    The Defendant, Bollinger Shipyards, Inc. is a Louisiana corporation with its principal place of business in Lockport, Louisiana.

1

3.    The Defendant, Bollinger Shipyards Lockport, L.L.C. is a Louisiana Limited Liability Company with its principal place of business in Lockport, Louisiana.

4.    The Defendant, Halter-Bollinger Joint Venture, L.L.C. is a Louisiana Limited Liability Company with its principal place of business in Lockport, Louisiana.

## Jurisdiction

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201 because complete diversity exists between the Plaintiff and Bollinger; the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs; and XL Specialty seeks declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*–the Federal Declaratory Judgment statute–and/or as provided by Louisiana Declaratory Judgment law, La. C.C.P. Art. 1871.

## Venue

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because at least some of the policies at issue in this matter were issued in this District.

## The United States' Claims Against Bollinger

7.    This action for a declaratory judgment arises from a claim that has been made by Bollinger against XL Specialty for coverage and benefits under certain insurance policies.  In that insurance claim, Bollinger seeks defense and indemnification with respect to claims brought by the United States of America ("United States") against Bollinger in Case No. 1:11-cv-01388, pending before the United States District Court for the Eastern District of Louisiana ("Lawsuit").  A copy of the United States' original Complaint in the Lawsuit is attached as Exhibit "A" to this Original Complaint for Declaratory Judgment and is incorporated herein, as if copied *in extenso*, solely for the

2

purpose of setting forth the claims and allegations asserted against Bollinger and in no way admitting or otherwise endorsing any of the allegations contained therein, it being understood that Bollinger denies all allegations of liability contained therein.

8.    The United States alleges in its Complaint that, from October 3, 2000 through August 20, 2004, Bollinger, through various acts, omissions, communications, and representations, falsely stated the actual section modulus depicting the longitudinal strength of the hulls for the design and modification of eight 123-Ft WPB U.S. Coast Guard cutters.

9.    The United States alleges in its Complaint that, in March 2004, the first 123-Ft WPB modified by Bollinger, the USCGC MATAGORDA, was delivered and accepted by the Coast Guard.

10.    The United States alleges in its Complaint that, on September 10, 2004, the USCGC MATAGORDA suffered a structural casualty that included buckling of the hull. An investigation by the Coast Guard and ICGS into the cause of the casualty found that Bollinger's S012-11 calculations overstated the actual section modulus depicting the longitudinal strength of the hull.

11.    The United States alleges in its Complaint that, eight 123-Ft WPBs were delivered to the Coast Guard by Bollinger, through ICGS.  None of the vessels possessed the longitudinal strength represented by Bollinger in the CDRL S012-11s submitted in September and December 2002.

12.    The United States alleges in its Complaint that, between November 22, 2002 and December 26, 2006, or soon thereafter, the Coast Guard paid ICGS approximately $78

million in response to 65 requests for payment by ICGS to the Coast Guard under the four DTOs for the work performed by Bollinger.

13.     The United States alleges in its Complaint that it has further sustained damages by the loss of the eight now-unusable 110-Ft WPBs modified by Bollinger, and other costs and losses resulting from Bollinger's actions.

14.     The United States alleges in its Complaint that Bollinger and the United States executed a statute of limitations tolling agreement, and extensions, effective December 5, 2008.

15.     The United States asserts its first cause of action under the False Claims Act: Making or Using False Record or Statement, 31 U.S.C. § 3729 (a)(1)(B)(2009).

16.     The United States asserts its second cause of action under the False Claims Act: Presentation of False Claims, 31 U.S.C. § 3729(a)(1)(2008).

17.     The United States asserts its third cause of action as Common Law Fraud.

18.     The United States asserts its fourth cause of action as Negligent Misrepresentation.

19.     The United States asserts its fifth cause of action as Unjust Enrichment.

20.     The United States prays for judgment on its Complaint awarding:

    a.      On Plaintiff's Count One, False Claims Act, judgment against the Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each violation, plus such other relief as the jury deems appropriate and just;

    b. On Plaintiff's Count Two, False Claims Act, judgment against the Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each violation, plus such other relief as the jury deems appropriate and just;

4

c. On Plaintiff's Count Three, Common Law Fraud, for damages in an amount to be determined, together with punitive damages, costs and interest;

d. On Plaintiff's Count Four, Negligent Misrepresentation, for damages in an amount to be determined, together with costs and interest;

e. On Plaintiff's Count Five, Unjust Enrichment, for damages in an amount to be determined, together with costs and interest;

f. And for all other and further relief as the Court may deem just and equitable.

g. For pre-judgment interest, post-judgment interest, fees and costs, as the jury deems appropriate and just.

## **Bollinger's Notice of the Events and Claim**

21.    The United States' Complaint alleges facts that, if proven, would establish that Bollinger management knew that Bollinger's representations of the actual section modulus depicting the longitudinal strength of the hulls for the design and modification of eight 123-Ft WPB U.S. Coast Guard cutters had been knowingly inaccurate and/or false from October 3, 2000 to the present.

22.    The United States' Complaint alleges facts that, if proven, would establish that Bollinger management knew that the actual longitudinal strength of the hulls of the eight 123-Ft WPB U.S. Coast Guard cutters had been inaccurately and/or falsely represented by Bollinger to the United States and that such inaccuracies and/or falsehoods would result in damage, at the latest, after the September 10, 2004, buckling of the hull of the USCGC MATAGORDA.

23.    The United States' Complaint alleges that,

On October 13, 2004, Bollinger vice president Hamblin stated in an internal email to CEO Bollinger and others that:

> . . . we did lead the CG into a false sense of security by telling them early on that the Section Modulus for a 123 would be 5230 [sic] inches cubed as opposed to the real number, just above 2600.

24.   By May 2007, at the latest, the Coast Guard formally revoked, in writing, acceptance of the WPBs, and asserted a claim for damages.  Therefore, by May 2007, at the latest, Bollinger had notice of the Coast Guard's and United States' claims relating to the WPBs.

25.   Despite knowledge of the facts and events, as alleged in the United States' Complaint, the claim arising from the buckling of the hull of the USCGC MATAGORDA, and even the May 2007 formal revocation of acceptance of all eight (8) WPBs, Bollinger did not notify XL Specialty about the underlying events or the Coast Guard's or United States' claim(s) until over four (4) years later, in approximately July 2011.

26.   Bollinger did not notify or inform XL Specialty of the United States' request for a statute of limitations tolling agreement and extensions, effective December 5, 2008, nor of Bollinger's agreement to and/or execution of such tolling agreement and extensions until approximately July 2011.

### XL Specialty's Policies and Their Provisions

27.   Bollinger has requested that XL Specialty defend and indemnify Bollinger under certain insurance policies, in connection with the United States' allegations in the Lawsuit.

28.   Over the period from September 30, 2000 to March 15, 2008, XL Specialty issued several Marine Comprehensive Liability Policies to Bollinger Shipyards, Inc.: (1) Policy No. PXMC-849330 for the period from September 30, 2000 to September 30, 2001; (2) Policy No. PXMC-849661 for the period from September 30, 2001 to

September 30, 2002; (3) Policy No. PXMC-849911 for the period from September 30, 2002 to September 30, 2003; (4) Policy No. PXMC-850151 for the period from September 30, 2003 to September 30, 2004; (5) Policy No. PXMC-850401 for the period from September 30, 2004 to December 31, 2005; (6) Policy No. PXMC-850684 for the period from December 31, 2005 to December 31, 2006; and (7) Policy No. PXMC-850942 for the period from December 31, 2006 to March 15, 2008.  XL Specialty pleads, as if set forth herein *in extenso*, all of these written policies of insurance, including all terms, provisions, limitations, exclusions, conditions, warranties, and/or endorsements to said policies, none of which have been or are waived.

29.    Each of the above-identified and incorporated Marine Comprehensive Liability Policies contains similar provisions.  As a representative, but non-exclusive example of pertinent policy provisions for the Marine Comprehensive Liability Policies and without waiver of any other provisions or coverage defenses, XL Specialty quotes the following provisions from Policy No. PXMC-850401.

30.    The Insuring Agreement under Section I - Coverages, Coverage A. Bodily Injury and Property Damage Liability provides in part as follows:

> 1.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.  We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.  But:
>
> > a.    The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION V); and
> >
> > b.    Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses

7

under Coverage C and/or Supplementary Payments under Section III.

* * *

2.   This insurance applies to "bodily injury" and "property damage" only if:

    a.   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

    b.   The "bodily injury" or "property damage" occurs during the policy period.

* * *

31.   The words and phrases that appear in quotation marks in the provisions of the Marine Comprehensive Liability Policies have special, or defined, meanings.   For instance, the phrase "property damage" in Policy No. PXMC-850401 means:

    a.   Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.   Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

32.   The word "occurrence" is defined in that policy as follows: "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

33.   Under Section II - Exclusions, A. Exclusions Applicable to Section I, Coverages A and B Only, Policy No. PXMC-850401 contains a number of exclusions to coverage. Some of those exclusions read in part as follows:

Notwithstanding anything to the contrary contained in this policy, it is hereby understood and agreed that this policy is subject to the following exclusions and that this policy shall not apply to:

1.      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. . . .

2.      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      a. Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

      b. That the insured would have in the absence of the contract or agreement.

* * *

26.      "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

      a.      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

      b.      A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

27.      Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

      a.      "Your product";

      b.      "Your work"; or

      c.      "Impaired property".

If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

28.      The failure of your products and/or "your work" to meet any predetermined level of fitness or performance and/or guarantee of such

fitness or level of performance and/or any consequential loss arising therefrom.

* * *

32.e.  Actual or alleged liability arising out of or incidental to any alleged violation(s) of any federal or state law regulating, controlling and governing antitrust or the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce including, without limitation, the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act and the Hart-Scott Rodino Antitrust Improvements Act; or

f.     Actual or alleged liability arising out of or contributed to by your dishonesty or infidelity.

* * *

33. Any negligence, error or omission, malpractice or mistake of a professional nature committed or alleged to have been committed by you or on your behalf in the conduct of any of your business activities or for which you agree to indemnify others under an "insured contract."

* * *

34.   Policy No. PXMC-850401 also contains several "General Conditions" to coverage.

Some of those conditions are as follows:

All coverages provided by or included in this policy and all endorsements attached to this policy are subject to the following conditions.  Read them carefully.

* * *

5.     Duties In The Event of Occurrence, Claim or Suit

a.     You must see to it that we are notified as soon as practicable after you become aware of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

(1)     How, when and where the "occurrence" or offense took place;

10

(2)     The names and addresses of any injured persons and witnesses; and

(3)     The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.     If a claim is made or "suit" is brought against any insured, you must:

(1)     Immediately record the specifics of the claim or "suit" and the date received; and

(2)     Notify us as soon as practicable after you receive or are advised of a "suit" or claim.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.     You and any other involved insured must:

(1)     Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2)     Authorize us to obtain records and other information;

(3)     Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

(4)     Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d.     No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

Knowledge of Occurrence

It is agreed that knowledge of an occurrence by an agent, servant or employee of the insured shall not in itself constitute knowledge by the insured unless an individual named insured, or a partner, or a manager or an "executive officer" or other person specifically assigned to handle such insurance related matters of the insured's corporation shall have received such notice from its agent, servant or employee.  Notwithstanding the

11

foregoing, however, this condition shall not apply to the discovery and claim reporting requirements of the Limited Pollution Buy-Back Endorsement, if such endorsement has been attached to and made a part of this policy.

* * *

11.     Other Insurance Or Protection

This policy is excess over any other insurance under that the insured has been afforded insured status, whether primary, excess, contingent or on any other basis, whether prior or subsequent hereto, and by whomever effected , directly or indirectly covering loss or damage insured hereunder, and this company shall be liable only for the excess of such loss or damage beyond the amount due from such other insurance up to, but not exceeding the limits of this policy as set forth in the declarations.

When this insurance is excess, we will have no duty under this policy to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that suit.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

* * *

13.     Representations

By accepting this insurance policy, you agree:

     a.     The statements in the Declarations are accurate and complete;

     b.     Those statements are based upon representations you made to us; and

     c.     We have issued this policy in reliance upon your representations.

Unintentional Non Disclosure

It is agreed that your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by the policy provided such failure or omission is not intentional.   It is further agreed, however, that such error shall be corrected when discovered with appropriate adjustment in premium.

* * *

35.   In addition to the foregoing, Policy No. PXMC-850401 contains several Endorsements.  One of those Endorsements is a Ship Repairer's Liability Endorsement (MCL 0295105), which provides certain specified Ship Repairer's Liability coverage. However, that Endorsement does not provide any insurance coverage for:

* * *

    i.    The expense of redoing "your work" improperly performed by or on your behalf or the cost of replacement of materials, parts or equipment furnished in connection therewith;

    j.    The cost or expense of repairing, replacing or renewing any faultily designed part or parts which cause(s) loss of or damage to the watercraft, or for any expenditure incurred by reason of a betterment or alteration in design;

    k.    Any loss of or damage to watercraft occurring while in your care, custody or control and otherwise covered under Section 1.a. hereof, but not discovered within twenty-four (24) months of the delivery of the watercraft to the owner or demise charterer, or within twenty-four (24) months after work is completed, whichever first occurs.

    l.    Loss, damage or expense arising in connection with:

* * *

    (2)    any watercraft undergoing reconstruction or conversion which entails a change in dimension, tonnage or type of watercraft.

However, another part of Policy No. PXMC-850401 indicates that Exclusion 3.l.(2) of the Ship Repairer's Liability Endorsement is deleted, "but only with respects to conversion risks for which builder's risk insurance is not purchased."

36.   Another Endorsement to Policy No. PXMC-850401 is entitled "U.S. Government Work Difference in Conditions Coverage Amendment (MCL 0295127), which provides:

In consideration of the additional premium shown in the schedule to this endorsement and subject to the terms and conditions of the policy, it is agreed that with respect to "your work" (either directly or indirectly as a

subcontractor of another entity) on any projects for the Government of the United States of America or branches thereof (U.S. Government), this insurance is amended only to cover the Difference in Conditions between those coverages provided under this policy and the extent of the release provided by the U.S. Government disregarding any other insurance type provisions contained in the U.S. Government contract.   The coverage provided by this endorsement shall not to be interpreted as to be providing excess, duplicate or simultaneous insurance or as contributing to or participating with the U.S. Government's indemnity provisions.

All Other Terms and Conditions Remain Unchanged.

37.   Policy No. PXMC-850401 also contains a Wharfinger's Liability Endorsement (MCL 0295114), which provides certain specified Wharfinger's Liability coverage. However, that Endorsement does not provide insurance coverage for:

\* \* \*

    g.    Watercraft repair, construction, alteration, conversion or gas freeing;

\* \* \*

38.   In addition to issuing the several Marine Comprehensive Liability Policies identified above, XL Specialty is a subscriber to several Marine Excess Liability ("Bumbershoot") Policies issued to Bollinger Shipyards, Inc. over the period from September 30, 2000 to December 31, 2007.  In particular, XL Specialty is a subscriber to the following policies: (1) PMEX-845870 for the period from September 30, 2000 to September 30, 2001; (2) PMEX-846605 for the period from September 30, 2001 to September 30, 2002; (3) PMEX-854178 for the period from September 30, 2002 to September 30, 2003; (4) PMEX-855291 for the period from September 30, 2003 to September 30, 2004; (5) UM00015378EL04A for the period from September 30, 2004 to December 31, 2005; (6) UM00015378EL05A for the period from December 31, 2005 to December 31, 2006; and (7) UM00015378EL06A for the period from December 31,

2006 to December 31, 2007.  XL Specialty pleads, as if set forth herein *in extenso*, all of these written policies of insurance, including all terms, provisions, limitations, exclusions, conditions, warranties, and/or endorsements to said policies, none of which have been or are waived.

39.    Each of the above-identified and incorporated Bumbershoot Policies contains similar provisions.  As a representative, but non-exclusive example of pertinent policy provisions for the Bumbershoot Policies and without waiver of any other provisions or coverage defenses, XL Specialty quotes the following provisions from Policy No. UM00015378EL04A.

40.    The Insuring Agreement of Bumbershoot Policy No. UM00015378EL04A provides in part as follows:

> A.    COVERAGE
>
> The Policy shall indemnify the **Insured** with respect to the operations listed in item 7 of the Declarations for the following . . .
>
> > 3.    All other sums which the **Insured** shall become legally liable to pay as **damages** on account of:
> >
> > > a.    **personal injuries**, including death at any time resulting therefrom, or
> > >
> > > b.    **property damage**,
>
> caused by or arising out of each **occurrence** happening anywhere in the world.
>
> Notwithstanding the foregoing, this Insurance shall not cover liabilities arising out of the insolvency or inadequacy of capital of any **Insured** or of any of the insurers listed in Item 6 of the Declaration.

40.    Terms in boldface type in the provisions of the Bumbershoot Policies have special, or defined, meanings.  For instance, the phrase **property damage** in Policy

No. UM00015378EL04A means: "physical loss of or direct physical to or destruction of

tangible property (other than property owned or occupied by the Named Insured)."

41.      The term **occurrence** means in part as follows:

> **"Occurrence"** shall mean an event or a continuous or repeated exposure
> to conditions which unintentionally causes injury, damages or destruction
> during the Policy Period which was unexpected by the **Insured**.  Any
> number of such injuries, damage, or destruction resulting from a common
> cause or from exposure to substantially the same conditions shall be
> deemed to result from one **occurrence**. . . .

42.      Section III of Policy No. UM00015378EL04A contains a number of exclusions

from coverage, some of which are as follows:

> A.      This insurance does not apply to:
>
> > 1.      any liability or expense arising out of the infidelity and/or
> > dishonesty of any **Insured**, or any employee or representative of
> > **Insured** whether committed individually or in collusion with
> > others.
> >
> > * * *
> >
> > 3.      liability of the **Insured** for any fines or penalties incurred
> > through the intentional act of the **Insured**.
> >
> > * * *
> >
> > 11.      Any liability for, or any loss, damage, injury or expense
> > caused by, resulting from or incurred by reason of:
> >
> > > a.      any obligation to pay fines, penalties, or exemplary or
> > > punitive damages including treble damages or any other
> > > damages resulting from the multiplication of compensatory
> > > damages.
> > >
> > > * * *
> > >
> > > h.      any liability or expense from the failure of the
> > > **Insured's** products or work completed by or for the
> > > **Insured** to perform the function or serve the purpose
> > > intended by the **Insured**, if such failure is due to a mistake

or deficiency in any design, formula, plan, specification, advertising material or printed instructions prepared or developed by any **Insured** except with the respect to **bodily injury** or **property damage** as a result of said failure provided such **property damage** or **bodily injury** is covered under the **Underlying Insurance**.

\* \* \*

j.      any activity as ship repairer or ship builder (other than for maintenance and repairs by the Assured to his own vessel) or from any activity as a wharfinger or bailee of watercraft unless such liability is covered by valid and collectible underlying insurance as listed in the schedule of underlying insurance, for the full limit shown therein, and then only for such hazards for which coverage is afforded under said underlying insurance.

Notwithstanding anything to the contrary herein, it is further agreed that this policy excludes losses arising from builders guarantee or errors in design. Builders guarantee shall be defined to include warranties with respect to performance specifications, quality of materials and timeliness of construction.

\* \* \*

o.      liability arising out of the following activities of the **Insured** unless coverage is provided in the **Underlying Insurance**, and then coverage hereunder shall only operate as excess of such coverage:

\* \* \*

(5)      arising out of goods or products manufactured, sold, handled or distributed by the **Insured** or by others trading under his name (hereunder called "the **Insured's** products) if the **occurrence** occurs after possession of such goods or products has been relinquished to others by the assured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the assured; provided such goods or products shall be deemed to include any container but shall not include any vending machine or any property other than such

17

container rented to or located for use of others but not sold;

(6)   arising out of operations, if the **occurrence** occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the **Insured**; provided that operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement;....

43.   The Bumbershoot Policies also contain a number of conditions, including the following:

B.  Assistance and Cooperation

The **Company** shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the **Insured**, but the **Company** shall have the right and shall be given the opportunity to associate with the **Insured** or the **Insured's** Underlying Insurers or both, in the defense and control of any claim, suit or proceeding relative to an **occurrence** where the claim or suit involves or appears reasonably likely to involve the **Company**, in which event the **Insured**, the Underlying Insurers and the **Company** shall cooperate in all things in the defense of such claim, suit or proceeding.

* * *

L.   Notice of Occurrence

Whenever the **Insured** has information from which the **Insured** may reasonably conclude that an **occurrence** covered hereunder involved injuries or damages which, in the event that the **Insured** should be held liable, is likely to involve this Policy, notice shall be sent to the **Company** as soon as practicable provided, however, that failure to notify **Company** of any **occurrence** which at the time of its happening did not appear to involve this Policy, but which at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

M.   Other Insurance

18

If other valid and collectible insurance is available to the **Insured** covering a loss also covered by this Policy, other than insurance that is written to be specifically in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance, either as double insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms conditions and limitations of other insurance.

44.   The Bumbershoot Policies further contain a number of endorsements.

a.   For instance, in Bumbershoot Policy No. UM00015378EL04A, Endorsement No. 8 is a Claims Made Amendment - Follow Form, which provides:

> It is understood and agreed that where coverage is provided by a scheduled underlying policy and is placed on a claims made basis, then this policy shall also be on a claims made basis and will follow such underlying terms as to any reporting or extended reporting periods. However it is further agreed and a limitation of this policy that regardless of any retroactive date or retroactive period that may be contained in a scheduled underlying claims made policy, in no case shall coverage hereunder apply to an occurrence prior to the inception date of this policy as shown on the policy declarations.

All other terms, conditions, limitations and exclusions remain unchanged.

b.   Endorsement No. 16 to Bumbershoot Policy No. UM00015378EL04A is a Professional Liability Exclusion, which states:

> It is understood and agreed that this insurance does not apply to any liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of any act, error, omission or mistake committed or alleged to have been committed by or on behalf of the **Insured** in rendering or failing to render service or advice of a professional nature.

> All other terms, conditions, limitations and exclusions remain unchanged.

## XL Specialty's Claim for Declaratory Relief

45.     XL Specialty hereby incorporates by reference all the preceding paragraphs of this Original Complaint for Declaratory Judgment.

46.     Pursuant to 28 U.S.C. § 2201, XL Specialty seeks a declaration of its rights and obligations under all of the above-identified Policies with respect to the allegations and claims against Bollinger in the Lawsuit.  XL Specialty's request for declaratory relief includes (but is not limited to) a request for a declaration of the following:

a.     That XL Specialty has no duty to defend (under any of its insurance policies) Bollinger against the allegations and claims of the United States in the Lawsuit;

b.     That XL Specialty has no duty to indemnify (under any of its insurance policies) Bollinger against any judgment or settlement with respect to the claims made by the United States in the Lawsuit;

c.     That some or all of the United States' claims against Bollinger in the Lawsuit do not involve sums that the insured becomes legally obligated or liable to pay as damages because of "property damage" to which the insurance applies;

d.     That the United States' claim for unjust enrichment does not involve sums that the insured becomes legally obligated or liable to pay as damages because of "property damage" to which the insurance applies;

e.     That some or all of the United States' claims against Bollinger in the Lawsuit do not involve "property damage" caused by or arising out of an "occurrence";

f.      That the United States' claims under the False Claims Act and for common-law fraud against Bollinger in the Lawsuit do not involve "property damage" caused by or arising out of an "occurrence";

g.      That some or all of the United States' claims against Bollinger in the Lawsuit do not involve any "property damage";

h.      That some or all of the United States' claims against Bollinger in the Lawsuit do not involve "an 'occurrence' that takes place in the 'coverage territory'";

i.      That some or all of the United States' claims against Bollinger in the Lawsuit do not involve an "occurrence";

j.      That if any "property damage" is involved in the Lawsuit, such "property damage" did not occur during the policy period of any of XL Specialty's insurance policies;

k.      That if any "property damage" is involved in the Lawsuit, such "property damage" was "expected or intended from the standpoint of the insured";

l.      That if any "property damage" is involved in the Lawsuit, such "property damage" is to "impaired property" or property that has not been physically injured and arises out of (a) a defect, deficiency, inadequacy or dangerous condition in Bollinger's product or work, or (b) a delay or failure by Bollinger or anyone acting on the behalf of any of them to perform a contract or agreement in accordance with its terms;

m.      That some or all of the damages claimed by the United States against Bollinger in the Lawsuit are for loss, cost or expense incurred by Bollinger or

others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of Bollinger's product, Bollinger's work, or "impaired property," and that such product, work, or property was withdrawn or recalled from the market or from use by a person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

n.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit, together with any judgment or settlement in that Lawsuit, are for the failure of Bollinger's products or work or both to meet any predetermined level of fitness or performance and/or guarantee of such fitness or level of performance and/or any consequential loss arising therefrom;

o.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of any act, error, omission or mistake committed or alleged to have been committed by or on behalf of Bollinger in rendering or failing to render service or advice of a professional nature;

p.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve actual or alleged liability arising out of or incidental to any alleged violation(s) of federal or state law regulating, controlling and governing activities in restraint of trade or unfair methods of competition or deceptive acts and practices in trade and commerce;

q.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve actual or alleged liability or expense arising out

of or contributed to by the infidelity and/or dishonesty of any of Bollinger or any employee or representative of Bollinger whether committed individually or in collusion with others;

r.      That some or all of the United States' claims and allegations in the Lawsuit involve Bollinger's liability for fines or penalties incurred through the intentional act of Bollinger;

s.      That some or all of the United States' claims and allegations in the Lawsuit involve liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of an obligation to pay fines, penalties, or exemplary or punitive damages including treble damages or any other damages resulting from the multiplication of compensatory damages;

t.      That some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve liability or expense from the failure of Bollinger's products or work completed by or for Bollinger to perform the function or serve the purpose intended by Bollinger; that such failure is due to a mistake or deficiency in any design, formula, plan, specification, advertising material or printed instructions prepared or developed by Bollinger; and that such claims and allegations are not covered under underlying insurance;

u.      That some or all of the United States' claims and allegations in the Lawsuit involve liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of any activity as ship repairer or ship builder or from any activity as a wharfinger or bailee of watercraft and that such liability is not covered by valid and collectible underlying insurance;

23

v.      That some or all of the United States' claims and allegations in the Lawsuit involve losses arising from builders guarantee or errors in design;

w.      That some or all of the United States' claims and allegations in the Lawsuit involve liability arising out of goods or products manufactured, sold, handled or distributed by Bollinger or by others trading under their names; that any "occurrence" occurred after possession of such goods and products had been relinquished to others by Bollinger or by others trading under their names; that any such "occurrence" occurred away from premises owned, rented or controlled by Bollinger; and that such liability is not covered by underlying insurance;

x.      That some or all of the United States' claims and allegations in the Lawsuit involve liability arising out of operations; that any "occurrence" occurred after such operations had been completed or abandoned and occurred away from premises owned, rented or controlled by Bollinger; and that such liability is not covered by underlying insurance;

y.      That Bollinger failed to give XL Specialty proper notice of an "occurrence" or an offense as required by XL Specialty's policies, and in particular Bollinger failed to notify XL Specialty as soon as practicable after they became aware of an "occurrence" or an offense which may result in a claim;

z.      That Bollinger failed to immediately record the specifics of the Coast Guard's and United States' claim or "suit" and the date received;

aa.     That Bollinger failed to notify XL Specialty as soon as practicable after they received or were advised of the Coast Guard's and United States' "suit" or claim;

bb.     That Bollinger failed to see to it that XL Specialty received written notice of the Coast Guard's and United States' claim or "suit" as soon as practicable;

cc.     That Bollinger failed to immediately send XL Specialty copies of any demands, notices, summonses, or legal papers received in connection with the Coast Guard's and United States' claim or "suit";

dd.     That Bollinger failed to cooperate with XL Specialty in the investigation of the Coast Guard's and the United States' claim or "suit";

ee.     That XL Specialty's insurance policies are excess over other insurance which is available to Bollinger covering a loss also covered by XL Specialty's insurance policies, or under which Bollinger has been afforded insured status;

ff.     That Bollinger intentionally failed to disclose all hazards existing as of the inception date of the XL Specialty insurance policies and that such error was not corrected when discovered with appropriate adjustment in premium;

gg.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit do not fall within the coverage of the Ship Repairer's Liability Endorsement;

hh.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve the expense of redoing Bollinger's work improperly performed by or on their behalf or the cost of replacement of materials, parts or equipment furnished in connection therewith;

ii.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve the cost or expense of repairing, replacing or renewing any faultily designed part or parts which caused loss or damage to the

WPBs, or involve expenditures incurred by reason of a betterment or alteration in design;

jj.     That if any "property damage" is involved in the Lawsuit, then some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve a loss of or damage to watercraft that was not discovered within twenty-four (24) months of the delivery of the watercraft to the owner or demise charterer, or within twenty-four (24) months after work was completed, whichever first occurred;

kk.     That if any "property damage" is involved in the Lawsuit, then some or all of the United States' claims and allegations against Bollinger in the Lawsuit involve loss, damage, or expense arising in connection with a watercraft undergoing reconstruction or conversion that entailed a change in dimension, tonnage, or type of watercraft and involve conversion risks for which builder's risk insurance was purchased;

ll.     That some or all of the United States' claims and allegations against Bollinger in the Lawsuit do not fall within the coverage of the Wharfinger's Liability Endorsement; and

mm.   That all of the United States' claims and allegations against Bollinger in the Lawsuit involve watercraft repair, construction, alteration, or conversion.

45.   XL Specialty reserves the right, as this case develops, to assert and rely upon additional policy provisions from the above-identified and incorporated policies, as well as any other policies of insurance which may be determined to exist and be applicable, since there may be other provisions that apply.  Therefore, XL Specialty requests that

the Court make such other and further declarations as may be appropriate in light of the evidence adduced and law.

46.    XL Specialty respectfully requests that it be awarded its reasonable and necessary attorneys' fees and costs incurred in the prosecution of this declaratory judgment action.

47.    All conditions precedent to the filing this lawsuit have occurred.

**WHEREFORE**, XL Specialty prays that the Court declare its rights and obligations under its Policies and that the Court award XL Specialty its reasonable attorneys' fees, costs, and such other and further relief, at law or in equity, to which it may be justly entitled.

Respectfully submitted,
**BROWN, SIMS, P.C.**

**By:   /s/ R. Jeffrey Bridger**
MARK L. CLARK (#30875)(T.A.)
R. JEFFREY BRIDGER (#01263)
650 Poydras Street, Suite 2200
New Orleans, Louisiana 70130
(504) 638-8472 Telephone
(504) 638-8473 Facsimile
**ATTORNEYS FOR PLAINTIFF,**
**XL SPECIALTY INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of August, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, thereby providing notice of electronic filing to all counsel registered for electronic service.  I further certify that I have served a copy of the forgoing pleading on all parties to this proceeding not registered for electronic service, by e-mailing, faxing, and/or mailing the same by United States mail, properly addressed and first class postage prepaid.

_____/s/ R. Jeffrey Bridger_____

27