UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

XL SPECIALTY INSURANCE COMPANY                    CIVIL ACTION

VERSUS                                            NO: 12-2071

BOLLINGER SHIPYARDS, INC., ET AL.                 SECTION: R(2)


**ORDER AND REASONS**

Before the Court are three motions for summary judgment and a motion to dismiss. The first motion, filed by Bollinger,[1] seeks a ruling that its liability insurer, XL Specialty Insurance Company, is obligated to pay Bollinger the defense costs it has incurred in defending against an underlying lawsuit.[2] Bollinger also requests that the Court award it statutory penalties, attorneys' fees, costs, and legal interest. The second motion, filed by XL, seeks a ruling that XL is not required to reimburse Bollinger for those defense costs.[3] In the third motion, filed by Continental Insurance Company, Bollinger's excess liability insurer, Continental, contends that its insurance policies do not afford Bollinger defense or indemnity in the underlying lawsuit.[4] The fourth motion,

---

[1]     "Bollinger" refers collectively to Bollinger Shipyards, Inc.; Bollinger Shipyards Lockport, L.L.C.; and Halter Bollinger Joint Venture, L.L.C.

[2]     R. Doc. 88.

[3]     R. Doc. 142.

[4]     R. Doc. 146.

filed by XL,[5] seeks to dismiss Bollinger's First Amended and Supplemental Complaint,[6] which was filed after briefing was nearly complete on the three motions for summary judgment. The Court heard oral argument on the motions for summary judgment on July 1, 2014.

The Court finds that XL is entitled to summary judgment because the policy unambiguously does not cover the allegations in the underlying lawsuit. Accordingly, the Court GRANTS XL's motion for summary judgment and DENIES Bollinger's cross-motion for summary judgment. In light of the Court's grant of summary judgment in XL's favor, XL's motion to dismiss Bollinger's amended complaint is DENIED as moot.

The Court GRANTS Continental's motion for summary judgment because the only claims remaining in the underlying lawsuit are not covered by Continental's excess policies.

## I.   BACKGROUND

This is an insurance coverage dispute regarding whether XL and Continental are obligated to pay defense costs that Bollinger incurred in defending against a False Claims Act suit brought by the United States. Both the False Claims Act suit and the present action are substantively and procedurally complex, and so it is necessary to set out the background of this case in some detail.

---

[5]   R. Doc. 197.

[6]   R. Doc. 184.

The Court will, first, describe the underlying lawsuit giving rise to Bollinger's claim for insurance coverage and outline the events leading to the present litigation; second, set forth the procedural history of this case; third, analyze the provisions of the various insurance policies that Bollinger claims provide coverage for the underlying lawsuit; and finally, identify the various grounds upon which the parties move for summary judgment.

**A.   The Underlying Lawsuit**

*1.   The United States' Allegations*

The underlying lawsuit arose out of Bollinger's involvement in the United States Coast Guard's Deepwater program to modernize its fleet of water vessels, aircraft, and electronics systems.[7] The United States alleged that Bollinger violated the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and committed fraud and negligent misrepresentation in connection with its work on that program. The facts giving rise to that suit, as alleged in the United States' complaint, are as follows.

In 1999, the United States selected Integrated Coast Guard Systems (ICGS), an entity comprised of Lockheed Martin Corporation (LMC) and Northrop Grumman Ship Systems, Inc. (NGSS), to serve as lead contractor of the Deepwater program, and ICGS in turn

---

[7]     R. Doc. 88 Ex. J at BGR-RAP-02049-50, ¶ 11.

subcontracted a portion of that work to Bollinger.[8] Bollinger was responsible for incorporating a thirteen-foot extension into eight 110-foot Coast Guard patrol boats.[9] Bollinger's responsibilities included the "design, engineering, performance requirements, and construction" of the modified cutters.[10]

During the initial stages of the program, the Coast Guard grew concerned about the feasibility of extending the cutters.[11] Specifically, the Coast Guard worried "that lengthening the vessel[s] w[ould] increase primary stress in the hull girder" and consequently make the vessels more susceptible to damage.[12] In October 2000, in response to these concerns, Bollinger prepared a longitudinal strength analysis that compared the section modulus (a measure of the vessel's longitudinal strength) of its design with the section modulus required by the American Bureau of Shipping (ABS).[13] Bollinger submitted this analysis to the Coast Guard stating that "the required section modulus is 3113 [inches cubed] and the actual section modulus of the patrol boat is 7152 [inches cubed]." This statement indicated that Bollinger's proposed design

---

[8]    *Id.* at BGR-RAP-02050, ¶¶ 12-13.

[9]    *Id.* at BGR-RAP-02050, ¶ 13; R. Doc. 88 Ex. G at 2-3.

[10]   *Id.* at BGR-RAP-02050, ¶ 13

[11]   *Id.* at BGR-RAP-02050-51, ¶ 15.

[12]   *Id.* at BGR-RAP-02051, ¶ 15.

[13]   *Id.* at BGR-RAP-02051, ¶ 16.

4

of the modified cutters yielded a section modulus that was greater than the ABS standard by a factor of 2.3.[14] Bollinger allegedly obtained this value by using a thicker hull plating in its design calculations than would actually be used in the modified cutters.[15] The United States alleged that, because "there was no provision in the proposal for replacing the hull plating on the 100-Ft [boats] with thicker hull plating during the conversion, using this thicker hull plating in the calculations was not reasonable."[16]

According to the complaint, the Coast Guard, relying in part on Bollinger's representations that the modified cutters would possess sufficient hull strength, selected IGCS to perform the work on the Deepwater program.[17] The Coast Guard and ICGS entered into a contract in June 2002.[18] The contract "contained a Contract Data Requirements List (CDRL), which identified information that ICGS and its subcontractors were required to provide the Coast Guard concerning the assets and other contract deliverables," and the contract required that "[f]inal deliverables . . . accurately represent the delivered condition of each asset."[19] Specifically,

---

[14]   *Id.* at BGR-RAP-02051-52, ¶¶ 16-18.

[15]   *Id.* at BGR-RAP-02052, ¶ 18.

[16]   *Id.*

[17]   *Id.* at BGR-RAP-02052, ¶ 20.

[18]   *Id.* at BGR-RAP-02052, ¶ 21.

[19]   *Id.*

the contract "required ICGS and its subcontractors to provide the Coast Guard with CDRL S012-11, a Hull Load and Strength Analysis (HLSA) to verify that the 123-Ft WPB modification design met program and contract requirements."[20]

In August 2002 the Coast Guard awarded the first Delivery Task Order for modification of the 110-foot patrol boats.[21] Later in August 2002, ABS offered to provide Bollinger with a "confidential assessment" of the proposed hull design for the converted boats.[22] Bollinger executives discussed the offer internally, but ultimately decided to decline the offer, allegedly because they were concerned that an ABS assessment "would find that the 123-Ft WPB design would require additional structure or structural support."[23]

Around the same time, Bollinger performed three different calculations of the section modulus of the proposed 123-foot cutter design using three different sets of input values.[24] Two of the calculations yielded a section modulus below the ABS standard; the third yielded a value of 5232 cubic inches, which was above the standard but still significantly below the value contained in

---

[20]    *Id.* at BGR-RAP-02053, ¶ 21.

[21]    *Id.* at BGR-RAP-020553, ¶ 22.

[22]    *Id.* at BGR-RAP-02053, ¶ 23.

[23]    *Id.* at BGR-RAP-02053-54, ¶¶ 23-25.

[24]    *Id.* at BGR-RAP-02054, ¶ 26.

6

Bollinger's initial longitudinal strength analysis.[25] On September 4, 2002, Bollinger submitted an initial version of CDRL S012-11 "that reported an actual section modulus of 5,232 cubic inches, the highest of the calculated values."[26] It then submitted a final version of CDRL S012-11 on December 16, 2002, again "reporting that the actual section modulus was 5,232 cubic inches."[27]

The complaint alleges that the input values used to obtain this highest result "did not reflect the actual structural characteristics of the converted vessels."[28] Bollinger did not report the two lower section modulus values to the Coast Guard.[29] The complaint further alleges that Bollinger told the Coast Guard that ABS would review the section modulus calculation of the proposed design and would "review compliance with ABS rules," but Bollinger never in fact requested such a review.[30]

Bollinger delivered the first of the 123-foot vessels, the USCGC MATAGORDA, to the Coast Guard in March 2004.[31] In September 2004, the "MATAGORDA suffered a structural casualty that included

---

[25]    *Id.*

[26]    *Id.* at BGR-RAP-02054, ¶ 29.

[27]    *Id.* at BGR-RAP-02055, ¶ 33.

[28]    *Id.* at BGR-RAP-02054-55, ¶¶ 29.

[29]    *Id.* at BGR-RAP-02055, ¶ 30.

[30]    *Id.* at BGR-RAP-02055, ¶¶ 31 & 33.

[31]    *Id.* at BGP-RAP-02055, ¶ 34.

buckling of the hull."[32] According to the United States, a subsequent Coast Guard and IGCS investigation revealed that Bollinger had misrepresented the longitudinal strength of the hulls of the cutters it delivered to the United States.[33] The United States further alleged that the eight vessels, all delivered after March 2004,[34] had insufficient longitudinal strength and consequently were unusable.[35] The Coast Guard and ICGS made efforts to increase the longitudinal strength of the modified cutters, but they were unsuccessful.[36]

   2.   *Procedural History of the Underlying Suit*

On December 14, 2006, the U.S. Department of Justice issued a litigation hold letter to Bollinger, advising Bollinger that it had opened an investigation into Bollinger's role in the Deepwater project and requesting that Bollinger retain documents related to the conversion of the 110-foot patrol boats.[37]

On May 17, 2007, the United States officially revoked acceptance of the eight cutters, explaining that "hull and shaft alignment problems" with the cutters had compromised their

---

[32]   *Id.* at BGR-RAP-02056, ¶ 36.

[33]   *Id.*

[34]   *Id.* at BGR-RAP-02055, ¶ 34.

[35]   *Id.* at BGR-RAP-02056, ¶ 37.

[36]   *Id.*

[37]   R. Doc. 142-5.

"physical integrity . . . to such a degree the performance specifications under the contract cannot be achieved and sustained."[38]   On June 14, 2007, Bollinger entered into a "Sponsorship Agreement" with NGSS providing that the two parties would cooperate in attempting to resolve the Coast Guard's claims.[39]

On November 29, 2007, the government issued a subpoena *duces tecum* to Bollinger that covered several categories of documents related to Bollinger's work on the Deepwater project.[40]

On December 23, 2008, Bollinger and the United States executed a statute of limitations tolling agreement.[41] The agreement provided in relevant part:

> WHEREAS, On December 5, 2008 the United States of America informed Bollinger . . . that the United States . . . [believes it] may have certain civil causes of action and administrative claims against Bollinger under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, other statutes and regulations including the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801 *et seq.*, equity, or the common law, arising from Bollinger's performance of conversion work on the U.S. Coast Guard Deepwater Program's 110 Foot Island Class vessels under Bollinger's contract with Northrop Grumman Ship Systems, Inc.; and
> WHEREAS, the parties have entered into discussions relating to the possible settlement of the United States's above claims prior to suit;
> NOW, THEREFORE, . . . the United States and Bollinger agree that, as consideration for the United States not filing, or initiating claims against Bollinger

---

[38]   R. Doc. 88 Ex. I at 1.

[39]   *See* R. Doc. 142-12; R. Doc. 142-14 at 10-11.

[40]   R. Doc. 142-15.

[41]   R. Doc. 142-20.

under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, or
the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801
*et seq.*, on or before December 31, 2008, the period of
time between and including December 5, 2008 and May 5,
2009 shall be excluded when determining whether any civil
or administrative claims are time-barred by the statute
of limitations, laches, or any other time-related
defenses. Bollinger further agrees it will not assert or
argue in any judicial or administrative forum that the
United States has failed to act in a timely fashion and
will not plead statute of limitations, laches, or any
other similar defense to any civil or administrative
action filed or initiated against Bollinger on or before
May 5, 2009 under the False Claims Act, 31 U.S.C. §§ 3729
*et seq.*, other statutes and regulations, including the
Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801 *et
seq.*, equity or the common law, based on the performance
of conversion work on the U.S. Coast Guard Deepwater
Program's 110 Foot Island Class vessels . . . except to
the extent such defenses were available to Bollinger on
or before December 5, 2008.[42]

Bollinger has since confirmed that as of the date of execution of
the Tolling Agreement, it had entered into settlement discussions
with the United States regarding the Coast Guard's claims.[43]
Bollinger did not inform XL of its intent to enter into the Tolling
Agreement.[44] Bollinger and the United States agreed to extend the
Tolling Agreement twenty-one times over the course of the next two
and a half years.[45]

Over the several-year course of the United States'
investigation of the Deepwater project, Bollinger made several

---

[42]   R. Doc. 142-20 at 1.

[43]   R. Doc. 142-14 at 5.

[44]   *Id.* at 7-9.

[45]   R. Doc. 142-21.

document productions to the United States, totaling about 40,000 documents.[46] It also made eight Bollinger employees available for interviews with the United States.[47]

On July 29, 2011, the United States filed a complaint against Bollinger based on allegations that "Bollinger knowingly misled the Coast Guard to enter into a contract for the lengthening of Coast Guard cutters by falsifying data relating to the structural strength of the converted vessels."[48] The United States' complaint alleged two violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as well as common law fraud, negligent misrepresentation, and unjust enrichment.[49]

On January 30, 2013, this Court dismissed the United States' complaint. *See United States v. Bollinger Shipyards, Inc.*, Civil Action No. 12-920, 2013 WL 393037 (E.D. La. Jan. 30, 2013). The Court held that Bollinger's FCA allegations and its common law fraud claim were deficient because the United States had not plausibly alleged that Bollinger acted with the requisite scienter or that Bollinger's allegedly false statements were material. *Id.* at *6-10. The Court also held that, while the complaint stated a negligent misrepresentation claim based on its allegations that

---

[46]   R. Doc. 142-9 at 13-14.

[47]   *Id.* at 14.

[48]   R. Doc. 88 Ex. J at BGR-RAP-02047, ¶ 1.

[49]   *See id.*

11

Bollinger submitted false section modulus values to the Coast Guard, that claim was time-barred. *Id.* at *11-14. Finally, the Court dismissed the United States' unjust enrichment claim because "there can be no claim for unjust enrichment when an express contract exists between the parties." *Id.* at *15. The Court granted the United States leave to amend its FCA and common law fraud allegations*. Id.* at *16.

The United States then filed an amended complaint, which presented additional factual allegations concerning Bollinger's alleged submission of false section modulus calculations to the Coast Guard. *See United States v. Bollinger Shipyards*, Civil Action No. 12-920, 979 F. Supp. 2d 721, 2013 WL 5720340, at *1 (E.D. La. Oct. 21, 2013). This Court found that the United States had once again failed to plausibly allege that Bollinger acted with the requisite scienter to support an FCA or a common law fraud claim, and accordingly dismissed the suit with prejudice. *Id.* at *10-11. The United States has appealed that ruling to the Fifth Circuit.[50] The United States has not appealed the Court's dismissal of its negligent misrepresentation, unjust enrichment, or common law fraud claims.[51]

---

[50]    *See United States of America v. Bollinger Shipyards, Inc. et al.*, No. 13-31301.

[51]    *See id.,* Appellant's Br. at 13.

12

**B.   Procedural History of the Present Lawsuit**

After the Coast Guard revoked acceptance of the ships in May 2007, Andrew St. Germain, Bollinger's Chief Financial Officer, wrote in an e-mail to Bollinger's insurance agent, Willis of Louisiana, that "[a]t this point, it may be prudent to put the appropriate underwriters on notice of this event."[52] Michael Tubbs, a Willis employee, responded, "OK! We will need a copy of the executed subcontract between [Bollinger] and NGSS."[53] The next day, Bollinger sent Tubbs the materials that he had requested.[54] Tubbs then relayed that information to Mike Johnson at Trident Marine Managers, XL's claims administrator, and asked "whether that was a claim that should be reported."[55]   According to Tubbs, Johnson responded "that it was not a claim that needed to be reported because he [Johnson] interpreted the letter from the Department of [J]ustice to implicate possible criminal actions, which he said were not covered by the [XL] Policy."[56] Johnson told Tubbs to "follow up if a specific claim for a specific dollar amount was made."[57]

---

[52]   R. Doc. 142-8 at 1.

[53]   *Id.*

[54]   *See id.* at 2.

[55]   R. Doc. 140-2 at 2.

[56]   *Id.*

[57]   *Id.*

13

On June 14, 2007, Bollinger entered into the "Sponsorship Agreement" with NGSS that provided the two parties would cooperate in attempting to resolve the Coast Guard's claims.[58] It did not seek XL's consent.[59] Indeed, Bollinger did not inform XL of the existence of the agreement for over four years.[60]

After the government issued the subpoena *duces tecum* on November 29, 2007, Bollinger contacted Willis to request again that Willis advise the appropriate underwriters of a "possible claim."[61] By February 2008, however, Bollinger knew that Willis had not notified any insurers of the potential claim.[62] Willis reasoned that "[i]t is doubtful that any underwriter would respond directly to the subpoena as no claim has been formally presented by any particular party and there is no claim of damage alleged at this point."[63] The record indicates that neither Bollinger, Willis, nor Bollinger's subsequent insurance agent, Arthur J. Gallagher Risk Management Services, Inc.,[64] ever did in fact apprise any of

---

[58]    *See* R. Doc. 142-12; R. Doc. 142-14 at 10-11.

[59]    *See* R. Doc. 142-9 at 16-17.

[60]    *Id.; see also* R. Doc. 142-10 at 2.

[61]    R. Doc. 142-16 at 3.

[62]    R. Doc. 142-14 at 9-10.

[63]    R. Doc. 142-16 at 1.

[64]    Bollinger appointed Gallagher as its insurance agent on February 1, 2008. R. Doc. 142-17.

Bollinger's insurers about the possibility of a claim related to the Deepwater project until days before the underlying lawsuit was filed.[65]

On July 19, 2011, Bill Condon, a Gallagher employee, e-mailed an XL employee advising her of the Deepwater investigation and asking if XL had a file on the subject.[66] Condon described the investigation as "a claim that should have been reported by Willis but apparently wasn't."[67] Gallagher put Continental on notice of the possible claim one day later, on July 20.[68]

Upon receipt of the United States' complaint on August 2, 2011, Bollinger notified XL of the FCA lawsuit.[69] According to the affidavit of Andrew St. Germain, Bollinger's Chief Financial Officer, "[r]eceipt of the U.S. lawsuit was the first time

---

[65]   *See* R. Doc. 142-9 at 10 (Willis has no record of having given notice of the United States' subpoena to any insurers); *id.* at 11 (Bollinger has no record of Gallagher giving notice of the United States' subpoena to any underwriters in 2008); *id.* at 11-12 (Bollinger admits that it has "no record of XL receiving notice of the United States' claims against Bollinger prior to July 19, 2011," or of Willis or Gallagher providing such notice); R. Doc. 142-14 at 5-6 (admitting that Bollinger did not inform XL of its discussions with the United States concerning the Deepwater project investigation until after July 18, 2011); R. Doc. 146-8 at 1 (Continental first received notice of the claim on July 20, 2011).

[66]   R. Doc. 142-23 at 1.

[67]   *Id.*

[68]   R. Doc. 146-8.

[69]   R. Doc. 88 Ex. J at BGR-RAP-2045 (letter from Bollinger to Gallagher regarding the underlying lawsuit).

Bollinger learned that the United States would allege that it had negligently misrepresented anything, or that it had allegedly enriched itself unjustly."[70] On September 30, 2011, counsel for XL issued a reservation of rights letter to Bollinger stating that XL had not yet made a determination whether the insurance policies it had issued to Bollinger covered the United States' allegations.[71] XL requested that the Bollinger entities "act as prudent uninsureds and file the necessary responsive pleadings in the lawsuit" while XL conducted an evaluation of Bollinger's claims.[72]

In November 2011, XL requested that Bollinger produce certain documents that XL needed in order to perform a complete coverage analysis.[73] The requested documents included those that Bollinger had produced to the United States in the course of the Deepwater investigation.[74] Bollinger did not produce those documents until after XL and Bollinger had filed the suits regarding coverage consolidated in this case,[75] which according to XL, made it impossible for XL to determine whether coverage was owed to

---

[70]    R. Doc. 88 Ex. G at 4.

[71]    R. Doc. 88 Ex. K; R. Doc. 142-10 at 2.

[72]    R. Doc. 88 Ex. K at 2.

[73]    R. Doc. 142-10 at 3; R. Doc. 142-26.

[74]    R. Doc. 142-19 at 9-11.

[75]    R. Doc. 142-10 at 3; R. Doc. 142-14 at 10.

Bollinger for the underlying suit.[76] Denice Borne, Bollinger's Risk Manager, stated that Bollinger did not produce all the requested documents because "it was over 300,000 documents[,] [a]nd it just became too cumbersome to provide."[77] It is undisputed that XL never denied or accepted coverage for defense of the underlying lawsuit, and Bollinger incurred its own attorneys' fees and costs defending against the United States' claims.[78]

XL initiated this action on August 13, 2012, seeking a declaration that it owed no duty to defend or indemnify Bollinger against the claims brought by the United States in the underlying suit.[79] XL's complaint for declaratory judgment alleged that (1) some or all of the claims in the underlying suit did not involve "property damage" or an "occurrence" as defined by the policy and therefore did not trigger the policy; (2) the claims fell within one or more policy exclusions; and (3) Bollinger breached its obligations under the policies in various material ways (failure to give notice, failure to cooperate, failure to obtain consent).[80] On August 15, 2012, XL removed a related action that Bollinger had filed in Louisiana state court, which sought coverage and bad faith

---

[76]   R. Doc. 142-10 at 3.

[77]   R. Doc. 142-19 at 10.

[78]   R. Doc. 88 Ex. G at 4-5.

[79]   *See* R. Doc. 1.

[80]   *See id.* at 20-26.

17

damages from XL and Continental.[81] In that suit, Bollinger alleged that XL was liable to it under Policy No. PXMC-850942, which covered a policy period from December 31, 2006, to March 1, 2008, and that Continental was liable to it under "multiple policies of excess insurance . . . covering the period of December 31, 2006, through March 1, 2012."[82] Bollinger also brought bad faith claims against both XL and Continental under Louisiana Revised Statutes §§ 22:1892 and 22:1973.[83] Continental filed a counterclaim seeking a declaratory judgment that none of the policies issued by Continental to Bollinger afford Bollinger coverage, defense costs, or indemnity in connection with the United States' claims.[84] The Court consolidated that case with the suit initiated by XL.[85]

On December 12, 2012, Continental filed a motion for partial summary judgment on Bollinger's bad faith claims. On June 24, 2013, the Court issued an Order and Reasons granting Continental's motion on the grounds that the express language of the excess policy issued by Continental indicated that Continental had no duty to

---

[81]    *See Bollinger Shipyards, Inc., et al. v. XL Specialty Insurance Company, et al.*, No. 12-02098, R. Doc. 1.

[82]    *See Bollinger Shipyards, Inc., et al. v. XL Specialty Insurance Company, et al.*, No. 12-02098, R. Doc. 1-1 at 4.

[83]    *See id.* at 3.

[84]    R. Doc. 14.

[85]    *See* R. Doc. 6.

18

defend,[86] and that in any event no duty to defend could arise for an excess insurer before the underlying policy had been exhausted, which had not occurred.[87] As Continental had therefore acted reasonably in denying Bollinger a defense, the Court dismissed Bollinger's bad faith claims against Continental.[88]

On December 18, 2013, Bollinger filed a motion for summary judgment against XL, arguing that the Court should hold as a matter of law that the policies XL issued to Bollinger require XL to pay the costs of defense that Bollinger incurred in the underlying lawsuit.[89] Bollinger further contends that XL was unreasonable in withholding payment of those costs, and hence should be liable for statutory penalties, attorneys' fees, costs, and interest. On April 3, 2014, XL filed a cross-motion for summary judgment, contending that XL is not responsible for Bollinger's defense costs, and seeking full summary judgment on its original complaint for a declaratory judgment that it has no duty to defend or indemnify Bollinger for the claims in the underlying suit.[90] On April 8,

---

[86]   R. Doc. 59.

[87]   *Id.* at 11-15 ("The [Continental] policies provide that that [Continental] has the right to participate in Bollinger's defense but has no obligation to do so." (citing *Inst. of London Underwriters v. First Horizon Ins. Co.*, 972 F.2d 125, 126 (5th Cir. 1992))).

[88]   *Id.* at 15-18.

[89]   R. Doc. 88.

[90]   R. Doc. 142.

Continental filed its own motion for summary judgment, arguing that it has no duty to defend or indemnify Bollinger against the underlying suit.[91]

On April 28, 2014, after briefing on the three motions was mostly completed, Bollinger moved the Court for leave to file an amended complaint that lists additional insurance policies under which XL and Continental may be liable.[92] The Court granted Bollinger's motion.[93] Bollinger's complaint now alleges simply that it is the "named insured[] under multiple liability insurance policies issued by XL Specialty and Continental."[94]

### C.   The Policies at Issue

#### 1.   The XL Policies

From September 30, 2001, through March 15, 2008, Bollinger obtained six separate Marine Comprehensive Liability policies from XL (the XL Policies).[95] The policies are virtually identical in all relevant respects, save that they cover different policy periods. The Court will analyze Policy Number PXMC-850151, which covers the

---

[91]   R. Doc. 146.

[92]   R. Doc. 163.

[93]   R. Doc. 185.

[94]   R. Doc. 186 at 2.

[95]   R. Doc. 88 Ex. G at 1-2.

20

period from September 30, 2003 to September 30, 2004,[96] as a representative example of the XL Policies.[97]

Section I of the policy, which sets forth the basic outline of the coverage it affords to Bollinger, provides in relevant part:

> 1.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. . . . . . . . .
> 2.   This insurance applies to "bodily injury" and "property damage" only if:
>       a.   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and
>       b.   The "bodily injury" or "property damage" occurs during the policy period.[98]

"Property damage" is defined as follows:

> a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; and
> b.   Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.[99]

---

[96]   R. Doc. 88 Ex. C.

[97]   As the Court explains below, Policy Number PXMC-850151 is in fact the only policy that could potentially cover the underlying lawsuit, because the only "occurrence" giving rise to the underlying suit happened during the policy period of this policy. *See infra* Section III.C.

[98]   R. Doc. 88 Ex. C. at XL 00318.

[99]   *Id.* at XL 00346.

A "suit" is defined as "a civil proceeding in which damage because of . . . 'property damage' . . . to which is this insurance applies are [*sic*] alleged."[100] "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[101] The parties do not dispute that all of the relevant events took place in the "coverage territory" as it is defined in the policy.

Section II of the policy contains several exclusions to coverage. Relevantly for purposes of this case, the policy does not apply to:

1.  "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. . . .
. . . .
26.  "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
     a.  A defect, deficiency, inadequacy or dangerous condition in 'your product' or your work;' or
     b.  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
     This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use.
27.  Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
     a.  "Your product";
     b.  "Your work"; or
     c.  "Impaired property".

---

[100]    *Id.*

[101]    *Id.* at XL 00344.

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

28. The failure of your products and/or "your work" to meet any predetermined level of fitness or performance and/or guarantee of such fitness or level or performance and/or any consequential loss arising therefrom.

. . . .

32. . . . .

. . . .

  e. Actual or alleged liability arising out of or incidental to any alleged violation(s) or any federal or state law regulating, controlling, and governing . . . deceptive acts and practices in trade and commerce . . .; or

  f. Actual or alleged liability arising out of or contributed to by your dishonesty or infidelity.[102]

"Impaired property" is defined as

tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate, or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment, or removal of "your product" or "your work;" or

b. Your fulfilling the terms of the contract or agreement.[103]

---

[102] *Id.* at XL 00320, XL 00328-29.

[103] *Id.* at XL 00342.

23

"Your product" means "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of" by the insured.[104] "Your work" is defined as

> a. Work or operations performed by [the insured] or on [its] behalf; and
> b. Materials, parts or equipment furnished in connection with such work or operations.
> "Your work" includes:
> a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
> b. The providing of or failure to provide warnings or instructions.[105]

Section VIII, "General Conditions," provides in relevant part as follows:

> All coverages provided by or included in this policy and all endorsements attached to this policy are subject to the following conditions. . . .
> . . . .
> 5.  Duties In The Event of Occurrence, Claim or Suit
>     a.  You must see to it that we are notified as soon as practicable after you become aware of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
>         (1)  How, when and where the "occurrence" or offense took place;
>         (2)  The names and addresses of any injured persons and witnesses; and
>         (3)  The nature and location of any injury or damage arising out of the "occurrence" or offense.
>     b.  If a claim is made or "suit" is brought against any insured, you must:
>         (1)  Immediately record the specifics of the claim or "suit" and the date received; and

---

[104]   *Id.* at XL 00346.

[105]   *Id.* at XL 00347.

24

(2) Notify us as soon as practicable after you receive or are advised of a "suit" or claim.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement, or defense of the claim or "suit;" and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

. . . .

10. Legal Action Against Us

No person or organization has a right under this insurance policy:

. . . .

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.[106]

---

[106]    *Id.* at XL 00336, 00338-40. Condition 5 has been amended by an endorsement to additionally provide that "knowledge of an occurrence by an agent, servant, or employee of the Insured shall not in itself constitute knowledge by the Insured unless an individual named insured, or a partner, or a manager or an 'executive officer' or other person specifically assigned to handle such insurance related matters of the Insured's corporation shall have received such notice from its agent, servant, or employee." *Id.* at XL 00368. The parties do not dispute that Bollinger's "executive officers" had knowledge of the relevant occurrence(s) at the same time as did any of its employees. Accordingly, this endorsement is not relevant to the issues implicated in the present motions.

25

2.    *The Continental Policies*

Continental issued several excess liability insurance policies to Bollinger for the years 2000-2004 and 2009-2010.[107] The policies relevant for purposes of these motions are the three issued for the period from September 30, 2003 to September 30, 2004: (1) Policy EXB118221, a second layer excess bumbershoot policy providing $25 million coverage in excess of $26 million,[108] Policy EXB118222, a third layer excess bumbershoot policy providing $50 million coverage in excess of 51 million,[109] and Policy EXB118223, a fourth layer excess bumbershoot policy providing $50 million coverage in excess of $101 million.[110] The three policies all followed the terms of a first layer excess bumbershoot policy issued by XL, Policy PMEX 855191-S.[111]

The bumbershoot policy issued by XL covered a Policy Period from September 30, 2003 to September 30, 2004 and provided $25 million of liability insurance excess of $1 million.[112] One of the policies underlying the bumbershoot policy was the general

---

[107]    R. Doc. 146-3 at 1-2.

[108]    R. Doc. 146-4.

[109]    R. Doc. 146-5.

[110]    R. Doc. 146-6.

[111]    R. Doc. 146-3 at 2; *see also* R. Doc. 146-4 at 6-7, 10, 13; R. Doc. 146-5 at 14; R, Doc. 146-6 at 7.

[112]    R. Doc. 146-7 at 1.

liability policy discussed *supra* Section I.C.1.[113] As relevant here,
the first layer bumbershoot policy indemnified Bollinger for

> 3.   All other sums which the **Insured** [Bollinger] shall
>      become legally liable to pay as **damages** on account
>      of:
>      a.   **personal injuries**, including death at any time
>           resulting therefrom, or
>      b.   **property damage**
>      caused  by  or  arising  out  of  each  **occurrence**
>      happening anywhere in the world.[114]

An "occurrence" is defined as "an event or a continuous or repeated
exposure to conditions which unintentionally causes injury, damages
or destruction during the Policy Period which was unexpected by the
Insured."[115] "Property damage" means "physical loss of or direct
physical damage to or destruction of tangible property (other than
property owned or occupied by the Named Insured)."[116]

The  policy  contains  several  exclusions  to  coverage.  Those
relevant for the present motions are as follows:

> A.   This insurance does not apply to:
> 1.   any liability or expense arising out of the
>      infidelity and/or dishonesty of any **Insured**,
>      or any employee or representative of **Insured**
>      whether committed individually or in collusion
>      with others.
>      . . . .
> 5.   any claims made by a national, state or local
>      Government,  or  sub-divisions  or  agencies
>      thereof,  unless  such  claims  be  for  damages

---

[113]   *Id.* at 19.

[114]   *Id.* at 3.

[115]   *Id.* at 6 (emphasis deleted).

[116]   *Id.* (emphasis deleted).

occasioned by actual or alleged personal injury (fatal or otherwise) or property damage.

. . . .

11. Any liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of:

. . . .

h. any liability or expense from the failure of the **Insured's** products or work completed by or for the **Insured** to perform the function or serve the purpose intended by the **Insured**, if such failure is due to a mistake or deficiency in any design, formula, plan, specification, advertising material or printed instructions prepared or developed by any **Insured** except with respect to **bodily injury** or **property damage** as a result of said failure provided such **property damage** or **bodily injury** is covered under the **Underlying Insurance**.

. . . .

o. liability arising our [*sic*] of the following activities of the **Insured** unless coverage is provided in the **Underlying Insurance**, and then coverage hereunder shall operate as excess of such coverage:

. . . .

(5) arising out of goods or products manufactured, sold, handled or distributed by the **Insured** . . . if the **occurrence** occurs after possession of such goods or products has been relinquished to others by the assured . . . and if such **occurrence** occurs away from premises owned, rented or controlled by the assured . . .

(6) arising out of operations, if the **occurrence** occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the **Insured**; provided that operations shall not be deeemed

28

> incomplete because improperly or
> defectively performed or because
> further operations may be required
> pursuant to an agreement . . . .[117]

Exclusions A.11.h and A.11.o are "conditional exclusions," meaning that their operation is conditional on the underlying liability policy not providing coverage. In other words, those provisions would not exclude coverage for a given claim if the primary XL policy discussed above covers that claim.

The XL bumbershoot policy also contains a notice provision, which reads as follows:

> **L.   Notice of Occurrence**
> Whenever the **Insured** has information from which the
> **Insured** may reasonably conclude that an **occurrence**
> covered hereunder involved injuries or damages
> which, in the event that the **Insured** should be held
> liable, is likely to involve this Policy, notice
> shall be sent to [XL] as soon as practicable
> provided, however, that failure to notify [XL] of
> any **occurrence** which at the time of its happening
> did not appear to involve this Policy, but which at
> a later date, would appear to give rise to claims
> hereunder, shall not prejudice such claims.[118]

Each of the four Bumbershoot policies (the first layer policy issued by XL and the second, third, and fourth layer policies issued by Continental) provides that the insurer has no duty to defend a claim made or suit brought against the insured.[119]

---

[117]   *Id.* at 6-10.

[118]   *Id.* at 13.

[119]   *See id.* at 11; R. Doc. 146-4 at 7; R. Doc. 146-5 at 14; R. Doc. 146-6 at 7; *see also* R. Doc. 59 at 11.

### D.   The Parties' Arguments

Bollinger argues that it is entitled to summary judgment on its claims for defense costs and bad faith penalties against XL because the XL Policies unambiguously afford Bollinger defense costs in the underlying lawsuit and because XL has been "unreasonable" in having paid no defense costs since the United States filed its complaint. According to Bollinger, at least some of the United States' allegations were based on "property damage" caused by "occurrences" that took place in the coverage territory and during the relevant policy periods, and are not otherwise excluded by the policies. Hence, Bollinger contends, XL had a duty to defend Bollinger against the entire lawsuit.

In response, XL offers two sets of arguments in favor of its contention that it is entitled to summary judgment against Bollinger. First, XL contends that Bollinger breached its obligations under the XL Policies to (a) provide prompt notice of the United States' claim to XL; (b) cooperate with XL in the investigation of that claim; and (c) obtain XL's consent before incurring defense costs. Second, XL argues that, even putting aside Bollinger's breaches of the policy provisions, the factual allegations of the United States' complaint do not disclose any possibility of liability under the policies because (a) the fortuity or "known loss" rule excludes coverage under several policies; (b) there was no "occurrence" within the meaning of the

30

policies; and (c) the following exclusions exclude coverage: (i) the "Impaired Property" exclusion (Exclusion 26); (ii) the "Sistership" exclusion (Exclusion 27); (iii) the "Predetermined/Guaranteed Level of Fitness or Performance" exclusion (Exclusion 28); and (iv) the "Dishonesty or Infidelity" exclusion (Exclusions 32.e-f). XL also asserts that Bollinger has not properly substantiated the amount of defense costs that it has requested.

For its part, Continental contends that it is entitled to summary judgment on all of Bollinger's claims because it has no duty to defend Bollinger; because, regardless of the Fifth Circuit's ruling on appeal of the underlying lawsuit, none of the United States' remaining claims are covered under the Continental policies; and because Bollinger failed to provide Continental with adequate notice of the United States' claims.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the

31

evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden

32

then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.; Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

**III. DISCUSSION**

> **A.   The Admissibility of the St. Germain Declaration and Related Exhibits**

Before addressing the merits of this dispute, the Court must attend to a preliminary evidentiary matter. XL argues that paragraphs 14, 15, 22, 23, 25, and 26 of the declaration of Bollinger's Chief Financial Officer, Andrew St. Germain,[120] attached to Bollinger's motion for summary judgment, are inadmissible because St. Germain lacks personal knowledge of the matters asserted therein and because his statements are hearsay.[121] XL also objects to the admissibility of certain documents (the spreadsheet

---

[120]   R. Doc. 88 Ex. G.

[121]   *See* R. Doc. 139-1.

33

attached to St. Germain's declaration and Exhibits L and N to Bollinger's motion for summary judgment) relating to the amount of defense costs incurred by Bollinger in defending against the underlying lawsuit and in bringing its claim against XL. The Court finds some of XL's objections well-taken.

Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge." *Amie v. El Paso Indep. Sch. Dist.*, 253 F. App'x 447, 451 (5th Cir. 2007) (quoting *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995)). This rule regarding affidavits is a specific application of the general rule that courts may consider only admissible evidence in ruling on a summary judgment motion. *See* Fed. R. Civ. P. 56(c)(2); *Mersch v. City of Dallas, Tex.*, 207 F.3d 732, 734-35 (5th Cir. 2000).

In his declaration, St Germain avers as follows:

14. Receipt of the U.S. lawsuit was the first time Bollinger learned that the United States would allege it had negligently misrepresented anything, or that it had allegedly enriched itself unjustly.
15. Upon receipt of this lawsuit, Bollinger promptly notified its insurers.
. . . .

34

22. Attached to Bollinger's Motion for Summary Judgment as Exhibit "L" is a true, correct, and complete copy, kept in the regular course of business, of Bollinger's submission to XL Specialty of legal expenses relating to the damages alleged by the United States of America, dated September 25, 2013.

23. Exhibit "N" attached to Bollinger's Motion for Summary Judgment, is a true and accurate reflection of the attorneys' fees and costs Bollinger has incurred in relation to its claims against XL Specialty, as of December 9, 2013, which have been kept in the regular course of Bollinger's business. These documents evidence that Bollinger has incurred $24,959.00 in attorneys' fees and $478.18 in costs in pursuing XL Specialty for defense costs and coverage in this matter.

. . . .

25. In relation to the damages alleged to the eight USCG vessels, Bollinger, between February 29, 2008, and July 29, 2011, incurred $3,332,585[122] in legal and related expenses in dealing with the United States of America.

26. Since the filing of the U.S. lawsuit, between July 29, 2011, and November 30, 2013,[123] Bollinger has incurred $5,657,780[124] in legal and related expenses in relation to the damage claims relating to the eight USCG vessels.[125]

St. Germain's declaration is devoid of facts suggesting that he has personal knowledge of the discussions between the United States and Bollinger before the FCA suit was filed. His deposition testimony confirms that he does not in fact have that knowledge.

---

[122]   In the affidavit, "$2,504,967.02" has been stricken out and "$3,332,585" written in by hand.

[123]   In the affidavit, "August 31" has been stricken out and "November 30" written in by hand.

[124]   In the affidavit, "$5,804,577.98" has been stricken out and "$5,657,780" written in by hand.

[125]   R. Doc. 88 Ex. G. at 4-5.

With regard to the progress of the United States' investigation, St. Germain admitted that he had no "independent knowledge of what Bollinger knew or didn't know about the claims that the government was making prior to receipt of the U.S. lawsuit."[126] He did not participate in the preparation of the tolling agreement; indeed, he never even saw any of those agreements.[127] Consequently, his statement that "[r]eceipt of the U.S. lawsuit was the first time Bollinger learned that the United States would allege it had negligently misrepresented anything, or that it had allegedly enriched itself unjustly" is clearly not based on personal knowledge, and hence is inadmissible. *See* Fed. R. Civ. P. 56(c); Fed. R. Evid. 602. The Court will strike this paragraph. *Cf. Bright v. Ashcroft*, 259 F. Supp. 2d 494, 498-99 (E.D. La. 2003) (striking portions of affidavit not based on personal knowledge). Paragraph 15, however, will not be stricken. The Court is satisfied that St. Germain has personal knowledge that Bollinger notified XL of the lawsuit shortly after it was filed -- and, in any event, that fact is not disputed. (The dispute concerns whether Bollinger should

---

[126]   R. Doc. 139-2 at 32; *accord id.* at 32-33 ("Q:. . . Were you ever privy to any conversation or discussion between the United States . . . and any Bollinger representative relative to the nature of the claims that the government was making against Bollinger, prior to the lawsuit being filed? A: The verbal conversation? . . . No, ma'am."); *id.* at 36-37 (St. Germain was not the "prime contact" in discussing the Deepwater investigation with the government).

[127]   *Id.* at 39.

have notified XL earlier in the Deepwater investigation, *before* the United States actually filed a complaint.) Further, the Court finds that as Bollinger's CFO, St. Germain has personal knowledge of the defense costs incurred by Bollinger. Accordingly, paragraphs 22, 23, 25, and 26 will not be stricken either.

**B.   Louisiana Law On Insurance Contracts**

*1.   General Principles of Contract Interpretation*

The parties agree that Louisiana law governs this contractual dispute.  "Under Louisiana law, 'an insurance policy is a contract that must be construed in accordance with the general rules of interpretation of contracts set forth in the Louisiana Civil Code.'" *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 516 (5th Cir. 2005) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 262 (5th Cir. 2003)). The Civil Code instructs that a court, in interpreting a contract, must ascertain the common intent of the parties. La. Civ. Code art. 2045; *Coleman*, 418 F.3d at 516; *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d  759, 763 (La. 1994). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. The words in a contract are assumed to carry their "generally prevailing meaning," unless the words have acquired a technical meaning. La. Civ. Code

37

art. 2047; *La. Ins. Guar. Ass'n*, 630 So. 2d at 763. Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.

"An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *La. Ins. Guar. Ass'n*, 630 So. 2d at 763. "Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and enforce reasonable conditions upon the policy obligations they contractually assume." *Id*. That being said, if ambiguities remain after the court applies the general rules of contractual interpretation, the ambiguities must be construed in favor of the insured. *Id.* at 764; *see also* La. Civ. Code art. 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text."); *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So. 2d 975, 976 (La. 1991) ("Equivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer, since these are prepared by the insurer and the insured had no voice in the preparation."). When confronted by an ambiguous provision in an insurance policy, the court will construe the provision as a "reasonable insurance policy purchaser would .

38

. . at the time the insurance contract was entered." *Breland v. Schilling*, 550 So. 2d 609, 610-11 (La. 1989).

"With respect to coverage, the insured bears the burden of proving that the incident giving rise to a claim falls within the policy's terms." *Coleman*, 418 F.3d at 517 (citing *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000)). But the insurer bears the burden of proving that an exclusion to coverage applies. *Id.* Exclusions "are construed strictly against the insurer and in favor of coverage." *Id.; accord Garcia*, 576 So. 2d at 976.

The scope of a duty to defend contained in a liability insurance policy is generally "broader than the scope of the duty to provide coverage." *Coleman*, 418 F.3d at 523 (quoting *Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 51-52 (La. 2005)); *accord Lamar Advertising Co. v. Cont'l Cas. Co.*, 396 F.3d 654, 660 (5th Cir. 2005). When determining an insurer's duty to defend, the court follows the "Eight Corners" rule: if, after comparing the terms of the policy to the allegations of the complaint, the Court determines that "'there are any facts in the complaint which, if taken as true, support a claim for which coverage is not unambiguously excluded,' the insurer must defend the insured." *Lamar Advertising*, 396 F.3d at 660 (quoting *Complaint of Stone Petroleum Corp.*, 961 F.2d 90, 91 (5th Cir. 1992)). "In making this determination, the Court must liberally interpret the complaint." *Id.* But, while the Court must accept as true the facts

39

alleged in the complaint for purposes of applying the Eight Corners
rule, the Court need not credit "statements of conclusions . . .
that are unsupported by factual allegations." *Coleman*, 418 F.3d at
523 (quoting *Jensen v. Snellings*, 841 F.2d 600, 612 (5th Cir.
1988)); *accord* William S. McKenzie & H. Alston Johnson, III, 15
Louisiana Civil Law Treatise, Insurance Law & Practice § 7:2 (4th
ed. 2012) ("It is well settled that the allegations of fact, and
not conclusions, contained in the petition determine the obligation
to defend."); *cf. PPI Tech. Servs., L.P. v. Liberty Mut. Ins. Co.*,
515 F. App'x 310, 314 (5th Cir. 2013) ("[T]he court must focus on
the factual allegations that show the origin of the damages rather
than the legal theories alleged. . . . It is not the cause of
action alleged that determines coverage but the *facts* giving rise
to the alleged actionable conduct." (citations omitted) (internal
quotation marks omitted) (applying Texas law)). "[O]nce a complaint
states one claim within the policy's coverage, the insurer has a
duty to accept defense of the entire lawsuit, even though other
claims in the complaint fall outside of the policy's coverage."
*Coleman*, 418 F.3d at 523 (alteration in original) (quoting
*Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co.*, 730 F.2d 377,
382 (5th Cir. 1984)); *accord* McKenzie & Johnson, *supra*, § 7:2.

## 2.   *Penalties for Failing to Pay Insurance Claims*

Louisiana law authorizes the recovery of bad faith penalties
from insurers who fail to pay legitimate claims under two nearly

identical provisions. *See* La. Rev. Stat. §§ 22:1892, 22:1973. Under section 22:1892(A)(1), "all insurers . . . shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured." If an insurer refuses to pay a claim within 30 days of receiving satisfactory proofs of loss, and its failure to do so is found to be "arbitrary, capricious, or without probable cause," then section 22:1892(B)(1) provides that the insurer is subject to pay a penalty equal to 50% of the loss, or one thousand dollars, whichever is greater. Section 22:1973 imposes on insurers "a duty of good faith and fair dealing" and provides for penalties if an insurer fails to pay a claim within sixty days after receipt of satisfactory proof of loss when "such failure is arbitrary, capricious, or without probable cause." La. Rev Stat. §§ 22:1973(A), 22:1973(B)(5). Both Section 22:1892 and Section 22:1973 can authorize an award of penalties for an insurer's breach of a duty to defend. *See Arceneaux v. Amstar Corp.*, 66 So. 3d 438, 452 (La. 2011) (section 22:1892); *Credeur v. McCullough*, 702 So. 2d 985, 987 (La. Ct. App. 1997) (section 22:1973).[128] "A plaintiff may be awarded penalties under only one of the two statutes, whichever is greater." *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009). Nonetheless, a plaintiff may recover attorneys' fees under section

---

[128]   Section 22:1973 was formerly codified at La. Rev. Stat. § 22:1220. *Credeur* was decided before the revision and so cites to § 22:1220.

22:1892 while seeking damages and penalties under section 22:1973. *Id.*

The phrase "arbitrary and capricious" means "[v]exatious" or "unjustified, without reasonable or probable cause or excuse." *Dickerson*, 556 F.3d at 297 (quoting *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So. 2d 1012, 1021 (La. 2003)). "An insurer does not act arbitrarily and capriciously . . . when it withholds payment based on a genuine (good faith) dispute about the amount of a loss or the applicability of coverage." *Id.* at 297-98 (citing *Calogero v. Safeway Ins. Co. of La.*, 753 So. 2d 170, 173 (La. 2000)). "Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action . . . ." *Reed*, 857 So. 2d at 1021.

### C.   XL Is Entitled to Summary Judgment

#### 1.   *Duty to Defend*

As a threshold matter, the Court briefly addressees the question of which XL policy or policies are at issue in this dispute. In its briefing, XL argued that the United States' claims in the FCA lawsuit could potentially trigger only one of its policies, Policy PXMC-850151, which covers the policy period from September 30, 2003 to September 30, 2004. In contrast, Bollinger's briefing on these motions suggested that more than one policy could be triggered.

42

XL is correct. Each of the XL policies "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period."[129] Under Louisiana law, property damage in construction defect cases is deemed to "occur at the point when it becomes manifest, or when it is discovered." *New Orleans Assets, L.L.C. v. Travelers Prop. Cas. Co.*, Nos. 01-2171, 02-974, 2002 WL 32121257, at *2 (E.D. La. Sep. 12, 2002); *see also Rando v. Top Notch Props., L.L.C.*, 879 So. 2d 821, 834 (La. Ct. App. 2004); McKenzie & Johnson, *supra*, § 6:5 ("The defective construction itself does not trigger coverage [in construction defect cases]. Instead, coverage is triggered under the . . . policy in effect when that defect causes physical injury to tangible property (*e.g.*, the roof leaks or the wall collapses)."). In the United States' complaint, the only "property damage" actually alleged to have become manifest is the structural casualty suffered by the MATAGORDA in September 2004.[130] Accordingly, Policy PXMC-850151, which covers the policy period from September 30, 2003, to September 20, 2004, is the only policy that could potentially cover the United States' claims. In addition, at oral argument, counsel for Bollinger appeared to concede that only Policy PXMC-850151 is at play.

---

[129]   R. Doc. 88 Ex. C. at XL 00318.

[130]   *See* R. Doc. 88 Ex. J. at BGR-RAP-02056, ¶ 36.

In any event, the parties agree that all of the XL policies are identical in all relevant respects. Therefore, the Court's analysis applies to each of the policies equally. Accordingly, whether only one policy is implicated or more than one policy is implicated does not affect the Court's analysis or conclusions about whether XL had a duty to defend Bollinger in the FCA lawsuit. For the purpose of clarity, the Court limits its discussion for the remainder of this order to XL Policy PXMC-850151 (henceforth referred to simply as the "XL policy").

The Court finds that the XL policy does not cover the United States' lawsuit and hence does not impose upon XL a duty to defend Bollinger because the claims for negligent misrepresentation and unjust enrichment are based entirely on allegations that fall within Exclusion 28 of the XL Policy and because the claims for common law fraud and the claims under the False Claims Act fall within Exclusions 32.e and 32.f. of the XL Policy.

*Exclusion 28*
*(Predetermined/Guaranteed Level of Fitness/Performance)*

Exclusion 28 provides that the XL Policy does not apply to "[t]he failure of your products and/or 'your work' to meet any predetermined level of fitness or performance and/or guarantee of such fitness or level of performance and/or any consequential loss arising therefrom."[131] The XL policy provides that "your work" means

---

[131]   R. Doc. 88 Ex. C at XL 00328.

44

"work or operations performed by you or on your behalf; and . . . [m]aterials, parts or equipment furnished in connection with such work or operations." In addition, "your work" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.'"[132] The Court finds that the United States' claims for negligent misrepresentation and unjust enrichment are based upon conduct that falls squarely within this exception.

A plain reading of the complaint reveals that the basis of the United States' claims for negligent misrepresentation and unjust enrichment is the failure of Bollinger's work to meet the longitudinal strength "level represented by Bollinger" throughout the bidding and development stages of the project.[133] Bollinger argues that because the words "guarantee," "fitness," and "predetermined" do not appear in the complaint, the exclusion does not apply.[134] Bollinger also argues that because the complaint does not make clear that any particular section modulus calculation was a "contract requirement," the complaint does not allege a failure to meet a "predetermined level of fitness or performance" or a "specific guarantee of fitness."[135] Bollinger cites no case law,

---

[132]   *Id.* at XL 00347.

[133]   R. Doc. 88 Ex. J at BGR-RAP-02056, ¶ 37.

[134]   R. Doc. 245 at 9.

[135]   *Id.*

however, to support its proposition that a represented level of performance cannot be a "predetermined level of performance" unless it is a contract requirement. XL, for its part, cites *Farrell Construction Co. v. Jefferson Parish Louisiana*, No. 86-4242, 1991 WL 68334 (E.D. La. Apr. 23, 1991), and *First Horizon Insurance Co. v. International Surplus Lines Ins. Co.*, No. 87-3616, 1989 WL 132856 (E.D. La. Oct. 31, 1989), for the proposition that the exclusion applies even when an agreement to meet a particular level of performance is only implicit. *See Farrell Const. Co.*, 1991 WL 68334, at *4 (damages resulting from failure of insured's work to meet an implied "expected level of quality and fitness" excluded); *First Horizon Ins. Co.*, 1989 WL 132856, at *3 ("Under the First Horizon contract, Amex implicitly represented that its performance would reach some minimum level."). These cases offer limited guidance in interpreting Exclusion 28, however, as the exclusion at issue in both cases is worded differently than Exclusion 28. Most importantly, the exclusion at issue in both *Farrell* and *First Horizon Insurance* excludes damages arising out of the failure of the insured's work  "to meet the level of performance, quality, fitness or durability *warranted or represented* by the named insured," whereas Exclusion 28 excludes damages arising out of the failure of the insured's work to meet a "*predetermined* level of fitness or performance."[136] Thus, *Farrell* and *First Horizon*

---

[136]   R. Doc. 88 Ex. C at XL 00328.

46

*Insurance* have little to say about what it means for a level of fitness of performance to be "predetermined."[137]

After a careful review of the allegations in the complaint, however, the Court concludes that even without using the precise word "predetermined," the United States nevertheless clearly alleges that Bollinger's work failed to meet a "predetermined level of fitness or performance." The Court applies the "Eight Corners" rule, comparing the terms of the exclusion against the facts supporting the United States' negligent misrepresentation and unjust enrichment claims. The Court focuses on the facts alleged, not conclusory labels applied to the claims. As the court stated in *Quick v. Ronald Adams Contractor, Inc.*, 861 So. 2d 278, 282 (La. Ct. App. 2003): "While the allegations of the petition are liberally interpreted in determining whether they set forth grounds that bring the claim within the scope of insurer's duty to defend a suit brought against an insured, allegations of fact, and not conclusions, contained in the petition, determine the obligation to defend." *See also Lodwick, L.L.C. v. Chevron U.S.A., Inc.*, 126 So. 3d 544, 551 (La. Ct. App. 2013) (studying the factual allegations

---

[137]  Indeed, although Exclusion 28 shares elements with common exclusions such as the "Your Products" and "Your Work" exclusions, the precise formulation presented by Exclusion 28 appears to be *sui generis*. The Court's survey of the case law reveals no cases interpreting an identically worded exclusion -- in particular, one involving a "predetermined level of fitness or performance" -- in state or federal court anywhere in the United States.

in a complaint to determine whether the factual basis for a variety of claims -- including, *inter alia*, breach of contract and unjust enrichment -- was conduct falling within the pollution exclusion of an insurance policy for purposes of evaluating duty to defend).

According to the United States' complaint, Bollinger was responsible for the "performance requirements" of the modified cutters.[138] The complaint alleges that in September of 2000, over two years before the Coast Guard signed a contract with IGCS, it raised feasibility concerns related to the conversion project, and in particular regarding the structural integrity of the hulls in light of the proposed modifications.[139] In response to these concerns, Bollinger prepared a longitudinal strength analysis of its design for the modified cutters that compared the section modulus of its design with the section modulus required by the American Bureau of Shipping (ABS).[140] According the complaint, Bollinger submitted this analysis to the Coast Guard stating that "the required section modulus is 3113 [inches cubed] and the actual section modulus of the patrol boat is 7152 [inches cubed]." This statement indicated that Bollinger's proposed design of the

---

[138]   R. Doc. 88 Ex. J at BGR-RAP-02050, ¶ 13.

[139]   *Id*. at BGR-RAP-02050, ¶ 15.

[140]   R. Doc. 88 Ex. J at BGR-RAP-02051, ¶ 16.

modified cutters yielded a section modulus that was greater than the ABS requirement by a factor of 2.3.[141]

According to the complaint, the Coast Guard, relying in part on Bollinger's representations that the modified cutters would possess sufficient hull strength, selected IGCS to perform the work on the Deepwater program.[142] The Coast Guard and ICGS entered into a contract in June 2002, which "contained a Contract Data Requirements List (CDRL), which identified information that ICGS and its subcontractors were required to provide the Coast Guard concerning the assets and other contract deliverables."[143] Specifically, the contract "required ICGS and its subcontractors to provide the Coast Guard with CDRL S012-11, a Hull Load and Strength Analysis (HLSA) to verify that the 123-Ft WPB modification design met program and contract requirements."[144] In accordance with this contract requirement, Bollinger submitted an initial version of CDRL S012-11 on September 4, 2002.[145] Bollinger's initial CDRL S012-11 "reported an actual section modulus of 5,232 cubic inches."[146] Bollinger submitted a final version of CDRL S012-11 on

---

[141]   *Id.* at BGR-RAP-02051-52, ¶¶ 16-18.

[142]   *Id.* at BGR-RAP-02052, ¶ 20.

[143]   *Id.*

[144]   *Id.* at BGR-RAP-02053, ¶ 21.

[145]   *Id.* at BGR-RAP-02054, ¶ 29.

[146]   *Id.*

49

December 16, 2002, again "reporting that the actual section modulus was 5,232 cubic inches."[147] Although this section modulus was lower than the section modulus of 7152 cubic inches submitted during the first phase of the project, it still exceeded the "ABS required section modulus" by a factor of 1.7.[148]

The Coast Guard went ahead with issuing its remaining work orders for the cutters.[149] Beginning in March 2004, "[i]n total eight 123-Ft WPBs were delivered to the Coast Guard by Bollinger, through ICGS" and "[n]one of the vessels possessed the longitudinal strength represented by Bollinger in the CDRL S012-11s submitted in September and December 2002."[150] The same paragraph of the complaint goes on to explain:

> Efforts to increase the longitudinal strength of the vessels were made by ICGS and the Coast Guard after the MATAGORDA's failure; these efforts did not increase the longitudinal strength to the level represented by Bollinger in its CDRLs. The modified cutters are now unusable. Had the Coast Guard been aware of the true section modulus at the time it issued the DTOs, it would not have proceeded with Bollinger's design for the modification of the 110-Ft WPBs.[151]

After the failure of the first ship, calculations revealed that the true section modulus of the modified cutters was 2,615 cubic

---

[147]   *Id.* at BGR-RAP-02055, ¶ 33.

[148]   *Id.* at BGR-RAP-02051-52, ¶ 18.

[149]   *Id.* at BGR-RAP-02053, ¶ 22.

[150]   *Id.* at BGR-RAP-02056, ¶ 37.

[151]   *Id.*

inches, well below the ABS standard.[152] The complaint alleges that as a result of the failure of the ships to meet the strength level represented by Bollinger, the United States suffered damages in the form of (1) payments of "approximately $78 million in response to 65 requests for payment . . . for the work performed by Bollinger and (2) "the loss of the eight now-unusable [cutters]."[153] In specific support of its negligent misrepresentation claim, the United States framed its damages as "a pecuniary loss."[154] In specific support of its unjust enrichment claim, the United States claimed that Bollinger "obtained payments from the Coast guard in return for the delivery of unseaworthy vessels."[155]

The entire basis for the allegations that the cutters were "unusable," a "loss," and "unseaworthy" is that they did not meet the longitudinal strength "level represented by Bollinger" throughout the bidding and development stages of the project.[156] Specifically, the complaint makes plain that Bollinger, the party responsible for "performance requirements,"[157] recognized and communicated from the earliest stages of the project that the "ABS

---

[152]   *Id.* at BGR-RAP-02056, ¶ 36.

[153]   *Id.* at BGR-RAP-02056-57, ¶ 38.

[154]   *Id.* at BGR-RAP-02059, ¶ 54.

[155]   *Id.* at BGR-RAP-02059, ¶ 56.

[156]   *Id.* at BGR-RAP-02056, ¶ 37.

[157]   *Id.* at BGR-RAP-02050, ¶ 13.

required section modulus" was 3113 cubic inches.[158] The complaint is also unambiguous that *at all times* before ICGS was chosen for the project, before the contract was signed, before any work orders issued, and before any ships were delivered, Bollinger represented that the cutters would not only meet, but would in fact substantially exceed the 3113 cubic inches required "level of performance." Finally, the complaint makes abundantly clear that Bollinger's work failed to meet this level of performance.

In sum, the conduct that forms the basis of the United States' claims for negligent misrepresentation and unjust enrichment is (1) the "representation" that Bollinger's work would meet a "predetermined level of performance" -- specifically, at a minimum, the 3113 cubic inches section modulus required by the ABS -- and (2) the failure of Bollinger's work to meet this predetermined level of performance. Because this failure both forms the entire basis of the United States' claims for negligent misrepresentation and unjust enrichment and falls squarely within Exclusion 28 of the XL policy, the exclusion prevents the policy from covering either claim.

Finally, although the United States did not make out a distinct cause of action for property damage, to the extent that it sought damages for "loss of the eight now-unusable [cutters]," the Court finds that 100% of these damages fall within the exclusion as

---

[158]    *Id.* at BGR-RAP-02051-52, ¶ 18.

well. Bollinger argues that Exclusion 28 does not preclude coverage for damage to the entire cutters because "[s]uch an exclusion is intended to apply only to the specific work performed by an insured."[159] Bollinger is incorrect. Exclusion 28 of the XL Policy is *not* limited only to damage to the specific work performed by Bollinger; to the contrary, it explicitly covers "consequential loss arising therefrom."

In support of its position, Bollinger cites *Underwriters at Lloyd's London v. OSCA, Inc.*, Nos. 03-20398, 03-20817, 03-21021, 2006 U.S. App. LEXIS 9717 (5th Cir. Apr. 12, 2006), and *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982). Neither case applies here because the language of the insurance policies in *OSCA* and *Todd Shipyards* differed markedly from the language of the XL Policy. In *OSCA*, OSCA had been hired to set a bridge plug in a fixed platform operated by a company called Newfield. OSCA failed to include a "back pressure valve" in the coiled tubing assembly that it used to set the bridge plug, and this failure resulted in an "uncontrolled blowout" that severely damaged the platform. 2006 U.S. App. LEXIS 9717, at *6-7. OSCA carried a liability insurance policy containing an exclusion that read as follows:

> **E. EFFICACY, LOSS OF USE, ETC.** Liability of the
>    insured:

---

[159]   R. Doc. 140 at 19; R. Doc. 245 at 8.

> (1) arising out of the failure of any Insured's
> Products or of work, including architectural or
> engineering services, by or on behalf of any
> Insured to meet any warranty or representation by
> any Insured as to the level of performance,
> quality, fitness or durability or *extent that such*
> *liability is for the diminished value or utility of*
> *Insured's Products or work by or on behalf of any*
> *Insured;*
> (2) without limiting paragraph (1) of the
> Exclusion E. *in respect of Property Damage to any*
> *Insured's Products or of work*, including, without
> limitation, architectural or engineering services,
> performed by or on behalf of any Insured, if such
> Property Damage arises out of any portion of such .
> . . work, or out of materials, parts or equipment
> furnished in connection therewith.

*Id.* at *65 (emphasis added). The Fifth Circuit, noting that this

provision applied only to damage to the insured's work itself, held

that it did not apply to the damages to the platform, because the

platform was not considered the "work" of OSCA. OSCA's "work" was

the setting of the bridge plug, and consequently the exclusion

covered only damage to that specific part of the platform. *Id.* at

*69-73.

Similarly, in *Todd Shipyards*, the court interpreted an

exclusion for "property damage *to work performed by . . . the named*

*insured* arising out of the work or any portion thereof" to apply

only to "the particular work performed by the insured, but not the

overall damage that the incorporation of the defective work product

causes to the entire entity." 674 F.2d at 420-21 (emphasis added).

Here, in contrast, Exclusion 28 of the XL Policy is not

limited to liability arising out of damage to the particular work

performed by the insured. It broadly provides that liability for "[t]he failure of your products and/or 'your work' to meet any predetermined level of fitness or performance and/or guarantee of such fitness or level of performance *and/or any consequential loss arising therefrom*" is not covered under the policy. Thus, the exclusion unambiguously precludes coverage for the United States' claims for damages to the cutters.

*Exclusions 32.e and 32.f*
*(Dishonesty and Infidelity Exclusions)*

XL contends that two exclusions relating to deception, dishonesty, and infidelity apply to the United States' claims: one for "[a]ctual or alleged liability arising out of or incidental to any alleged violation(s) of any federal or state law . . . governing . . . deceptive acts and practices in trade and commerce," and one for "[a]ctual or alleged liability arising out of or contributed to by [the insured's] dishonesty or infidelity."[160]

Bollinger rightfully concedes that these exclusions, by their plain terms, preclude coverage for the United States' common law fraud claims and its claims under the False Claims Act.[161] But Bollinger claims that the United States' negligent misrepresentation and unjust enrichment allegations do *not* fall

---

[160]   R. Doc. 88 Ex. C at XL 00329.

[161]   *See* R. Doc. 140 at 20-21.

55

within this exclusion, and consequently that XL had a duty to defend the entire lawsuit.[162] Bollinger's alleged liability stemming from those claims, however, falls entirely within the predetermined level of fitness/performance exclusion to coverage as explained above. Hence, none of the United States' claims were covered by the XL Policy, and accordingly XL had no duty to defend Bollinger in the underlying lawsuit.

    2.   *Other Exclusions*

Since the Court has resolved the duty to defend issue on the basis of Exclusion 28, Exclusion 32.e, and  Exclusion 32.f, the other exclusions briefed by the parties are not essential to the result and thus do not merit extended discussion. For the sake of completeness, however, the Court briefly explains why the other exclusions asserted by XL fail to exclude all of the claims in the United States' complaint.

*Exclusion 1*
*("Intentional Acts" Exclusion)*

XL suggests that it does not owe Bollinger defense costs because the United States' complaint alleges only intentional acts of fraud. Specifically, XL argues that the United States' claims for negligent misrepresentation and unjust enrichment are not supported by the facts actually alleged. XL is incorrect. The United States' complaint plausibly alleges negligent (as opposed to

---

    [162]   *Id.* at 21 (citing *Lamar Advertising Co. v. Cont'l Cas. Co.*, 396 F.3d 654, 660 (5th Cir. 2005)).

intentional) misrepresentation. Indeed, when the Court granted
Bollinger's first motion to dismiss in the underlying suit, it
explicitly held that "the United States' factual allegations
identify the elements of duty, breach, and damages necessary for a
plausible negligent misrepresentation claim." *United States v.
Bollinger Shipyards, Inc.*, Civil Action No. 12-920, 2013 WL 393037,
at *11 (E.D. La. Jan. 30, 2013). Accordingly, at least one of the
United States' claims alleged a non-intentional act. Thus,
Exclusion 1 does not absolve XL of the duty to defend.

*Exclusion 26*
*("Impaired Property" Exclusion)*

XL also contends that Exclusion 26 absolves it of any duty to
defend the United States' lawsuit. That exclusion provides that the
policy does not apply to

> "Property damage" to "impaired property" or property that
> has not been physically injured, arising out of:
> a.   A defect, deficiency, inadequacy or dangerous
>      condition in "your product" or "your work;" or
> b.   A delay or failure by you or anyone acting on your
>      behalf to perform a contract or agreement in
>      accordance with its terms.
> This exclusion does not apply to the loss of use of other
> property arising out of sudden and accidental physical
> injury to "your product" or "your work" after it has been
> put to its intended use.[163]

"Impaired property" is defined as "tangible property, other than
'your product' or 'your work,' that cannot be used or is less
useful because . . . [i]t incorporates 'your product' or 'your

---

[163]   R. Doc. 88 Ex. C at XL 00328.

57

work' that is known or thought to be defective, deficient, inadequate or dangerous," if the property "can be restored to use by . . . [t]he repair, replacement, adjustment, or removal of 'your product' or 'your work.'"[164]

Louisiana case law is clear that the impaired property exclusion does not apply to property that has been physically injured. *See, e.g.*, *Stewart Interior Contractors, L.L.C. v. Metalpro Indus., L.L.C.*, 969 So. 2d 653, 664 (La. Ct. App. 2007) (citations omitted) ("We find the 'impaired property' exclusion to be clear and unambiguous. The exclusion precludes coverage for damage to property that has not been physically injured or for which only loss of use is sought. . . . [T]he exclusion does not apply where there is physical damage to property other than the insured's work or product after the product has been put to its intended use."); *see also Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 876 (5th Cir. 2009) (holding that any damages based on "actual physical injury" would not be excluded under an impaired property provision); McKenzie & Johnson, *supra*, § 6:20 ("The exclusion is not applicable when there is loss of use due to physical injury to the tangible property."). This rule prevents Exclusion 26 from absolving XL of its duty to defend, because the United States' complaint alleges damages for "actual physical injury" to the MATAGORDA. *Martco*, 588 F.3d at 876.

---

[164]    *Id.* at XL 00342.

In addition, the Fifth Circuit held in *Martco* that the
"restoration provision" of the "impaired property" definition
limits the exclusion to situations in which the impaired property
can be completely restored by the replacement or repair of the work
done by the insured. *Id.* There, Martco, a building product
manufacturer, had hired Wellons to make certain improvements to a
thermal oil heating system located at a plant owned by Martco. *Id.*
at 870. The "improvements" did not work out as planned, however;
following the completion of Wellons' work, numerous problems arose
with the heating system that allegedly damaged the infrastructure
of the plant and resulted in "unplanned downtime." *Id.* at 870-71.
The Fifth Circuit held that an exclusion in Wellons' liability
insurance policy virtually identical to Exclusion 26 did not
preclude coverage for the lawsuit that Martco eventually brought
against Wellons. *Id.* at 875-76. The court reasoned that "for the
exclusion to apply, the complaint must unambiguously state that
'impaired property' is susceptible to full restoration by
repairing, replacing, adjusting, or removing the insured's 'work'
or the insured's 'product.'" *Id.* at 876. "Nothing in the complaint
unambiguously demonstrate[d] such a simple solution would repair
Martco's infrastructure." *Id.* This was because Wellons' defective
work had caused other consequential damages to other parts of the
Martco plant that could not be repaired simply by replacing the
heating unit.

Here, the complaint does not "unambiguously state" that simply remedying Bollinger's defective work would make the cutters usable. *Id.* To the contrary: the complaint specifically alleges that efforts to repair the cutters by "increas[ing] the longitudinal strength of the vessels" had been attempted and had failed.[165] For this reason as well, Exclusion 26 does not absolve XL of its duty to defend.

### *Exclusion 27*
### *("Sistership" Exclusion)*

Finally, XL argues that the policy's "sistership" exclusion precludes coverage for the FCA lawsuit. The exclusion provides that the policy does not apply to

> [d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> a.    "Your product";
>
> b.    "Your work"; or
>
> c.    "Impaired property".
>
> if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.[166]

The name "sistership exclusion" is "derived from aircraft coverage in situations in which the crash of an airplane would result in the

---

[165]    R. Doc. 88 Ex. J at BGR-RAP-02056, ¶ 37.

[166]    R. Doc. 88 Ex. C at XL 00328.

grounding or recall of all sisterships." McKenzie & Johnson, *supra*, § 6:22. "The exclusion deals only with damages resulting from activities with respect to the sisterships; it is not applicable to damages arising out of the original occurrence which gave rise to the apprehension about sisterships." *Id.; see also Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir. 1982) ("The [sistership] provision is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. It is not, however, intended to exclude from coverage damages caused by the very product whose failure to perform properly aroused apprehension about the quality of 'sister' products."). Thus, the exclusion does not absolve XL of its duty to defend, because the United States' complaint alleges damages "caused by the very product whose failure to perform" led to the withdrawal of the sisterships. *Todd Shipyards*, 674 F.2d at 419.

3.   *Notice*

Because the Court has already resolved the duty to defend issue in XL's favor on the basis of XL's policy exclusions, the Court need not reach the question of whether Bollinger's alleged breach of the policy's notice provision might have also precluded coverage. Nevertheless, again in the interest of comprehensiveness and because the parties briefed the issue extensively, the Court addresses the question of notice here.

The XL policy provides that Bollinger "must see to it that [XL is] notified as soon as practicable after [Bollinger] become[s] aware of an 'occurrence' or an offense which may result in a claim."[167] XL contends that this provision triggered a duty on the part of Bollinger to notify XL about the Deepwater investigation by, at the latest, May 17, 2007. XL points out that on that date the Coast Guard officially revoked acceptance of the eight patrol boats, citing "design flaws" that caused "hull buckling and shaft alignment issues."[168] This letter, XL argues, certainly made Bollinger aware "that it was then confronting 'an offense which may result in a claim,' if not an actual claim, requiring notice."[169] But Bollinger did not notify XL of the investigation until July 2011, only days before the United States filed its complaint.

---

[167]   R. Doc. 88 Ex. C at XL 00338.

[168]   R. Doc. 142-6 at 1.

[169]   R. Doc. 142-1 at 13.

Bollinger argues that it fulfilled its notice obligations under the XL policy because it contacted its insurance broker, Willis, immediately after the Coast Guard revoked acceptance of the vessels. Willis, in turn, contacted XL's claims administrator, Trident, to relay the information about the revocation. The parties agree that at that time, Trident told Willis no claim needed to be reported because the "correspondence from the government implied possible criminal actions," which were not covered by the XL policy."[170] Accordingly, Bollinger contends, its duty to notify XL arose only when "talks had broken down, and a lawsuit was imminent."

Nevertheless, Bollinger admits that Trident "advised that Bollinger should follow-up if the United States brought a specific claim for a specific dollar amount."[171] Yet on June 14, 2007, without notifying XL, Bollinger entered into a "Sponsorship Agreement" with NGSS that provided the two parties would cooperate in attempting to resolve the Coast Guard's claims.[172] On November 29, 2007, the government issued a subpoena *duces tecum* to Bollinger that covered several categories of documents related to Bollinger's work on the Deepwater project.[173] Again, Bollinger did not notify

---

[170]   R. Doc. 140 at 3; R. Doc. 142-1 at 13.

[171]   R. Doc. 140.

[172]   *See* R. Doc. 142-12; R. Doc. 142-14 at 10-11.

[173]   R. Doc. 142-15.

XL. Finally, on December 23, 2008, Bollinger and the United States executed a statute of limitations tolling agreement.[174] Once again, Bollinger did not notify XL.

It is clear that Bollinger was aware of an "'occurrence' . . . which may result in a claim" by, at the latest, December 2008, when Bollinger and the United States executed the tolling agreement. Trident stated that Bollinger need not notify XL of the revocation of the eight cutters because it "implicate[d] possible criminal actions, which . . . were not covered by the Policy."[175] But the tolling agreement explicitly states that the United States believed it had "certain civil causes of action and administrative claims against Bollinger under the False Claims Act, . . . other statutes and regulations . . . , equity, or the common law."[176] It follows that, by December 2008, Bollinger knew that the United States might file a civil lawsuit against it based on the failure of the MATAGORDA and Bollinger's work on the Deepwater project more generally. That is, Bollinger knew that there had been an "occurrence" that might result in a claim. Yet Bollinger did not notify XL of that fact for nearly four years, until it was certain that the United States would file suit. This constitutes a breach of Bollinger's notice obligation under the XL Policy.

---

[174]    R. Doc. 142-20.

[175]    R. Doc. 140-2 at 2.

[176]    R. Doc. 142-20 at 1.

"[W]hen prompt notice of a covered occurrence is a 'condition precedent' to recovery under an insurance policy, and the insured fails to give such notice, the claim is no longer covered by the policy, regardless of whether the insurer can demonstrate prejudice." *Gulf Island, IV v. Blue Streak Mar., Inc.*, 940 F.2d 948, 955 (5th Cir. 1991) (citing *MGIC Indem. Corp. v. Cent. Bank of Monroe*, 838 F.2d 1382, 1385-87 (5th Cir. 1988)); *accord In re Matter of Complaint of Settoon Towing, L.L.C.*, 720 F.3d 268, 277 (5th Cir. 2013); *Jackson v. Transp. Leasing Co.*, 893 F.2d 794, 795 (5th Cir. 1990). But when notice is not a condition precedent to recovery, the insurer may avoid liability only if it can show that it was prejudiced by the insured's failure to give timely notice. *Gulf Island*, 940 F.2d at 956; *see also Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1173 (5th Cir. 1992).

"Whether a notice provision is a 'condition precedent' to recovery depends on the language of the policy . . . ." *Settoon Towing*, 720 F.3d at 277-78. The traditional rule in Louisiana has been that "express condition precedent language . . . [is] necessary to make giving notice a condition precedent to recovery." *Gulf Island*; 940 F.2d at 956; *accord Peavey Co.*, 971 F.2d at 1173 ("The rule in Louisiana is that where the requirement of timely notice is not an *express* condition precedent, the insurer must demonstrate that it was sufficiently prejudiced by the insured's late notice." (emphasis added)); *see also Transcontinental Pipe*

65

*Line Corp. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 378 F. Supp. 2d 729, 738 (M.D. La. 2005) ("Louisiana law requires that th[e condition precedent] language be explicitly included in the insurance contract, and cannot be inferred." (citing *Am. Safety Risk Servs., Inc. v. Legion Indem. Co.*, 153 F. Supp. 2d 869, 876 (E.D. La. 2001))).

The XL policy contains no express condition precedent language. Rather, XL asks the Court to infer a condition precedent by reading the notice provision in conjunction with the "no action" clause of the policy, which provides that "[n]o person or organization has a right under this insurance policy . . . [t]o sue us on this Coverage Part unless all of its terms have been fully complied with."[177] *Settoon Towing*, which XL cites in support of its position, is distinguishable from this case. There, the court held that a notice condition in an endorsement was "a 'condition precedent' despite not using the precise phrase 'condition precedent.'" 720 F.3d at 278. In that case, however, the court confronted an endorsement providing that one of the policy's exclusions "shall not apply provided that the Named Assured establishes that all of the following conditions have been met: . . . The occurrence was reported in writing to [the insurer] within 30 days after having been known to the assured." *Settoon Towing*, 720 F.3d at 274. The court found that the notice provision was a

---

[177]   R. Doc. 88 Ex. C at XL 00340.

condition precedent to recovery, reasoning that "[s]hort of the exact phrase 'condition precedent,' there is almost no stronger language that could establish a 'condition precedent' to recovery." *Id.* at 278.

Here, however, the XL Policy does not contain such strong language. The "no action" clause in the XL Policy provides that the insured cannot sue on the policy without complying with its terms, but it does *not* say that coverage is precluded if the General Conditions are not satisfied. Without stronger language, the Court concludes that a condition precedent "cannot be inferred." *Transcon. Pipe Line Corp.*, 378 F. Supp. 2d at 738 (citing *Am. Safety & Risk Servs., Inc. v. Legion Indem. Co.*, 153 F. Supp. 2d at 876.). Thus, although XL "argue[s] strenuously that a condition precedent is implied in the contract, [it] cannot point to an express condition precedent, which is required by controlling law." *Am. Safety & Risk Servs., Inc. v. Legion Indem. Co.*, 153 F. Supp. 2d at 876.

Since notice is not a condition precedent to recovery, XL can avoid liability on notice grounds only if it can show that it was prejudiced by Bollinger's failure to give timely notice. *Gulf Island*, 940 F.2d at 956. Under Louisiana law, it is extraordinarily difficult for an insurer to show actual prejudice from breach of a notice condition at the summary judgment stage. Insurers are not entitled to summary judgment "based upon only 'the naked delay in

notifying the insurer of the suits brought against the insured,' . . . absent unusual or aggravated circumstances, such as failure to provide notice until after trial on the merits." *State ex rel. Div. of Admin., Office of Risk Mgmt. v. Nat'l Union Fire Ins. Co. of Louisiana*, 56 So. 3d 1236, 1246 (La. Ct. App. 2011) (quoting *Miller v. Marcantel*, 221 So.2d 557, 559 (La. Ct. App. 1969)). Relevant here, Louisiana courts have rejected arguments by insurers that they were prejudiced by reason of their inability to participate in pretrial discovery. *See, e.g.*, *Champion v. Panel Era Mfg. Co.*, 410 So. 2d 1230, 1237-38 (La. Ct. App. 1982) (affirming jury finding that insurer was not prejudiced by its failure to receive notice until several weeks after trial because it had the opportunity to "re-take any depositions which had already been taken, or pursue any other discovery deemed necessary by counsel"). Prejudice has generally only been found at the summary judgment stage when the insurer is not notified until the eve of trial, or even after trial. *See MGIC*, 838 F.2d at 1386 n.2 (citing *Hallman v. Marquette Cas. Co.*, 149 So. 2d 131, 135 (La. Ct. App. 1963)); *Elevating Boats, Inc. v. Gulf Coast Mar., Inc.*, 766 F.2d 195, 199-200 (5th Cir. 1982); *Branzaru v. Millers Mut. Ins. Co.*, 252 So. 2d 769, 770 (La. Ct. App. 1971).

*Gulf Island* and *Auster Oil & Gas, Inc. v. Stream*, 891 F.2d 570 (5th Cir. 1990), are two clear examples of this phenomenon. In *Gulf Island*, the court held that a four-year delay on the part of the

insured in notifying the insurer of damage to a vessel was not necessarily prejudicial, even though the delay effectively prevented the insurer from investigating the accident. 940 F.2d at 956 ("[T]here is insufficient summary judgment evidence that Lloyd's, by not having the opportunity to send in its own experts, or otherwise by not being notified for over four years, has been prejudiced."). In *Stream*, the Fifth Circuit found that summary judgment in favor of the insurer on the prejudice issue was improper even though the insurer had been notified of the underlying suit after the liability portion of the trial had taken place. 891 F.2d at 579. The court noted that there was evidence that the insurer would have denied coverage and a defense even had it been timely notified, that the insurer was represented at the liability portion of the trial, and that the insurer had not forfeited any defenses it might otherwise have. *Id.*

Here, XL was not prejudiced by Bollinger's breach of its notice obligation. First, there is no merit to XL's argument that Bollinger, by executing the tolling agreements with the United States, "waived rights that XL, on Bollinger's behalf, could have exercised."[178] The tolling agreement explicitly provides that it does not bar Bollinger from asserting "defenses [that] were available to Bollinger on or before December 5, 2008," the date

---

[178]    R. Doc. 142-1 at 20.

69

that the first tolling agreement was executed.[179] Thus, the tolling
agreements did not cause Bollinger to "forfeit" any statute-of-
limitations or other time-related defenses it had already accrued.
They simply stopped the clock to prevent any new statute-of-
limitations or time-related defenses from accruing while the
parties attempted to work out a settlement.

Next, XL argues that the extensive presuit discovery in which
Bollinger engaged was unnecessary given that the case was
ultimately dismissed on the pleadings. But that contention is not
necessarily accurate; the Court considered the advanced stage of
discovery in making the determination to dismiss the underlying
lawsuit with prejudice. *See United States v. Bollinger Shipyards,
Inc.*, Civil Action No. 12-920, 2013 WL 5720340, at *11 (E.D. La.
Oct. 21, 2013). Moreover, given XL's consistent position that the
XL Policy does not cover the United States' claims, it appears
likely that XL would have refused to defend Bollinger even if it
had been timely notified. *Cf. Stream*, 891 F.2d at 579. Thus, XL's
contention that it might have "participate[d in] and comment[ed] on
the scope of pre-suit discovery and . . . influence[d] the
confection of a protective order" strains credulity.[180]

Finally, Bollinger succeeded in getting the United States'
claims dismissed. XL appears to argue that perhaps the United

---

[179]    R. Doc. 142-20 at 1.

[180]    R. Doc. 142-1 at 21.

States' claims could have been dismissed *sooner* had Bollinger directly challenged the claims instead of pursuing a settlement. It is impossible to say that XL could have gotten the suit dismissed *faster* had it been notified of the Deepwater investigation earlier. XL makes this argument with the benefit of hindsight. Because XL was not prejudiced by Bollinger's failure to give timely notice, XL is not entitled to summary judgment based on Bollinger's failure to provide timely notice as required under the XL Policy.

### 4. *Bad Faith Claims*

Because the Court has found that XL had no duty to defend Bollinger against the United States' claims, Bollinger's argument that XL acted in bad faith in refusing to reimburse Bollinger's defense costs necessarily fails. *See Little v. USAA Cas. Ins. Co.*, 655 F. Supp. 2d 625, 635 (W.D. La. 2009) ("[T]he question of bad faith is pretermitted by this Court's determination that there is no coverage under the policies."). XL is not liable for statutory penalties, attorneys' fees, costs, or interest.

### 5. *Duty to Indemnify*

The United States has appealed this Court's dismissal of the underlying suit to the Fifth Circuit.[181] In its appeal, the United States expressly chose to pursue only its claims under the False

---

[181]   *See United States of America v. Bollinger Shipyards, Inc. et al.*, No. 13-31301.

Claims Act.[182] Thus, they are the only claims relevant to the indemnity question. As Bollinger has rightfully conceded, Exclusions 32.e and 32.f--the fraud exclusions--plainly preclude coverage for the United States' claims under the FCA.[183] Therefore, XL is also entitled to a declaratory judgment that it has no duty to indemnify Bollinger.

### D. Continental Is Entitled to Summary Judgment

As the basis for the Court's June 24, 2013 order granting partial summary judgment to Continental on Bollinger's bad faith claims, the Court held that the plain terms of the Continental Policies "unambiguously exclud[e] a defense obligation under Louisiana law." *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.*, 954 F. Supp. 2d 440, 446 (E.D. La. 2013) (quoting *Inst. of London Underwriters v. First Horizon Ins. Co.*, 972 F.2d 125, 126 (5th Cir. 1992)).[184] Furthermore, the Court noted that any duty that could arise on the part of Continental to reimburse Bollinger for defense costs would not be triggered until exhaustion of the $26 million underlying policies. *See id.* at 446-47. Bollinger has not yet come

---

[182]   *See id.,* Appellant's Br. 13.

[183]   *See* R. Doc. 140 at 20-21.

[184]   The policies explicitly provide that Continental "shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured." R. Doc. 146-4 at 7.

close to reaching that point; its claimed defense costs as of December 2013 were just under $9 million.[185]

As discussed above, the Court has since dismissed the underlying suit and the United States has appealed to the Fifth Circuit. The only claims remaining in the case on appeal are those brought under the False Claims Act. Therefore, any possible duty to defend or indemnify on Continental's part could only arise from the FCA claims. Accordingly, the Court limits its analysis to the FCA claims. The FCA claims are not covered by Continental's policy.

The Continental Policies follow on XL's first layer bumbleshoot excess policy, which provides coverage to Bollinger for "sums . . . [Bollinger] shall become legally liable to pay as damages on account of: . . . **personal injuries**, including death at any time resulting therefrom, or . . . **property damage.**"[186] "Property damage" means "physical loss of or direct physical damage to or destruction of tangible property (other than property owned or occupied by the Named Insured)."[187] In short, Continental's policies are triggered only by liability for damages for personal injuries or physical property damage.

A claim under the FCA is fundamentally not a claim for damages for either personal injury or property damage. The FCA provides, in

---

[185]   *See* R. Doc. 88-1 at 14.

[186]   R. Doc. 146-7 at 3.

[187]   *Id.* (emphasis deleted).

relevant part, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for treble damages and civil penalties. 31 U.S.C. § 3729(a)(1)(A)&(B). In determining whether to impose liability under the False Claims Act, the Fifth Circuit considers "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009). Accordingly, the government's damages in an FCA claim consist solely of funds paid in reliance upon a false statement. Thus, an FCA claim, by definition, is not a claim for damages for personal injury or physical damages. Facts relating to a personal injury or physical damage may help establish the fraudulent nature of a claim for payment, but the personal injury or physical damages are not the damages for which an FCA claim seeks to recover.

The Seventh Circuit's decision in *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center, Inc.,* is illustrative. 566 F.3d 689 (7th Cir. 2009). In that case, a liability insurer brought a declaratory judgment action seeking

a declaration that it had no duty to defend its insured, a nursing home called Momence, in an underlying suit. The underlying suit was brought under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.,* and its Illinois counterpart. *Id.* at 691. Former Momence employees alleged that Momence had filed false claims with the United States and the State of Illinois by falsely certifying that it had met the standard of care required for payment under Medicare and Medicaid. *Id.* (noting "the statutory requirement that Medicare and Medicaid providers may not submit claims for services that failed to meet 'professionally recognized standards of health care'" (quoting 42 U.S.C. § 1320c-5(a)(2))). The underlying complaint included factual allegations that some nursing home residents had sustained bodily injuries as a result of Momence's failure to comply with the applicable standard of care. *Id.* Similar to here, Momence's insurance policy provided that the insurer would "pay those sums that the insured [Momence] becomes legally obligated to pay as damages because of 'bodily injury.'" *Id.* at 692 n.2.

The Seventh Circuit held that the insurer had no duty to defend Momence in the underlying suit. The court explained that "[a]lthough the allegations in the underlying complaint detailing the injuries suffered by Momence residents put a human touch on the otherwise administrative act of false billing, they need not be proven by the plaintiffs to prevail." *Id.* at 695. All the

75

plaintiffs needed to show was that Momence had "billed the government for services and a level of care it knew it was not providing." *Id.*

Just as the underlying suit in *Momence Meadows* contained factual allegations of personal injury, the underlying suit here contains factual allegations of property damage. Most significantly, the United States alleges that on September 10, 2004, the Coast Guard cutter MATAGORDA "suffered a structural casualty that included buckling of the hull."[188] Nevertheless, just as in *Momence Meadows*, the factual allegations of physical damage are not necessary for the False Claims Act claims to succeed. Liability turns, rather, on whether Bollinger made materially false statements with the requisite *scienter*, and on whether the government paid money in reliance on those statements. Thus, though the underlying suit involves some *allegations* of physical damages, the United States' FCA claims cannot lead to *liability for damages* for physical damages. Therefore, the FCA claims cannot trigger Continental's policies.

Because neither of the two claims remaining in the underlying suit are covered by Continental's policies, Continental is entitled to summary and declaratory judgment that it has no duty to defend or indemnify Bollinger in the under lying suit.

---

[188]    R. Doc. 88 Ex. J at BGR-RAP-02056, ¶ 36.

76

**IV. CONCLUSION**

  For the foregoing reasons, the Court GRANTS XL's motion for summary judgment, DENIES Bollinger's cross-motion for summary judgment, DENIES XL's motion to dismiss as moot, and GRANTS Continental's motion for summary judgment.


  New Orleans, Louisiana, this 31st day of October, 2014.


              *Sarah Vance*

            SARAH S. VANCE
       UNITED STATES DISTRICT JUDGE